884 P.2d 345

Obidio T. **MONTALVO**, Plaintiff–
Appellee/Cross–Appellant,

v.

John **LAPEZ**, City and County of Honolu-
lu, Defendants–Appellants/Cross–Appel-
lees, and Doe Defendants 1–25, Defen-
dants.

Obidio T. **MONTALVO**, Plaintiff,

v.

Daniel **MAKEKAU**, I. Doi Hauling
Contractors, Inc., and Doe De-
fendants 1–25, Defendants.

No. 16913.

Supreme Court of Hawai'i.

Oct. 12, 1994.

Reconsideration Denied Nov. 29, 1994.

Hazel G. Beh (Milton S. Tani, with her on the briefs), Deputy Corp. Counsels, Honolulu, for defendants-appellants/cross-appellees.

David C. Schutter (Mitchell S. Wong, with him on the briefs), Honolulu, for plaintiff-appellee/cross-appellant.

Before MOON, C.J., LEVINSON, NAKAYAMA, and RAMIL, JJ., and WEIL, Circuit Judge, in place of KLEIN, J., recused.

MOON, Chief Justice.

Defendants - appellants / cross - appellees John Lapez and the City and County of Honolulu (collectively, the City) appeal from a jury verdict in the First Circuit Court awarding $770,000.00 in damages against the City in favor of plaintiff-appellee/cross-appellant Obidio Montalvo resulting from a multi-vehicle rearend accident caused by the negligent operation of a City refuse truck.[1]

On appeal, the City asserts that the trial court erred by: (1) improperly instructing the jury in several respects; (2) restricting the scope of the special verdict form; (3) denying its motion for remittitur or new trial; and (4) admitting irrelevant documents into evidence. On his cross-appeal, Montalvo asserts that the trial court erred by excluding expert testimony on hedonic damages,[2] and therefore, if the case is remanded for further proceedings, he should be allowed to present such expert testimony.

We vacate the trial court's judgment and remand for a new trial. With respect to Montalvo's cross-appeal, we affirm the trial court's decision to exclude expert testimony on hedonic damages.

## I. FACTUAL BACKGROUND

### A. The Accident At Issue In This Case

On November 29, 1988, Montalvo was injured in a rearend, chain reaction automobile accident caused by the negligent operation of a City refuse truck driven by Lapez [hereinafter, the 1988 City accident or the City accident]. As a result of the accident, Montalvo allegedly hit his head and lost consciousness. X-rays taken at Straub Hospital's emergency room revealed instability in Montalvo's lower spine and a congenital condition known as spondylolisthesis—a condition that makes one susceptible to back injuries.

### B. Montalvo's Prior Accident History

The record indicates that, prior to the 1988 City accident, Montalvo had been involved in several other accidents dating back to the mid–1960s. His first automobile accident occurred in 1964, wherein he injured his back, broke an arm, sustained burns, and was hospitalized for a month.

In 1980, Montalvo was involved in another automobile accident when a vehicle struck him at high speed. Among other injuries, Montalvo reinjured his back and fractured his pelvis. Montalvo underwent surgery and remained in the hospital for four months.

On June 27, 1987, Montalvo was again injured when a twenty-five ton dump truck, driven by Daniel Makekau, rearended him, throwing his body into the windshield [hereinafter, "the 1987 Makekau accident"]. Shortly after the 1987 Makekau accident, Montalvo began experiencing ringing in his ears, blurred vision, and pain to his head, neck, and back. Subsequently, he underwent surgery in March 1988 to remove a disc in his neck.

Montalvo was also the victim of two assaults prior to the 1988 City accident. On December 24, 1987, an unknown culprit assaulted Montalvo from behind, apparently hitting and kicking him several times in the spine and hip. According to hospital records, he was treated for back and hip pain. On April 15, 1988, Montalvo was struck in the face by his girlfriend during a domestic dis-

---

1. *Montalvo v. Makekau* (Civ. No. 89–2846), which was consolidated at the trial level with Montalvo's case against the City (Civ. No. 89–2723–09), settled on the eve of trial in November 1993.

2. Hedonic damages are damages "for the loss of enjoyment of life, or for the value of life itself, as measured separately from the economic productive value that an injured or deceased person would have had." *Black's Law Dictionary* 391 (6th ed.1990).

pute, aggravating the pain from his recent neck surgery.

### C. Montalvo's Post–1988 City Accident Events

After the 1988 City accident, Montalvo allegedly aggravated his condition on several different occasions. His medical records indicate that he "was feeling pretty good until yesterday [June 25, 1989] when he went to the beach and tried a little boogey board. Neck and back really sore."

On July 18, 1989, Montalvo's doctor noted that Montalvo told him he "had to push [his] car off the road and change a flat," complaining that "my back and neck are killing me." Again, on March 27, 1990, the medical record reads, "[p]atient states he was changing a tire on the Pali on 3/27 and has had a marked increase in pain involving his neck since that time. ROM [range of motion] of the cervical spine is markedly restricted."

A medical record entry of May 21, 1991 indicates that

> [Montalvo] did recently attempt to go fishing with one of his friends; however, once the surf became rough he ended up down in the hatch of the boat as his back and neck became quite painful. He also has increased pain in his neck when attempting to work on his automobile.

On July 6, 1991, a CAT scan revealed a bulging disc in Montalvo's lower back. Based on his doctor's recommendation, Montalvo underwent surgery on November 11, 1991.

At trial, Montalvo testified that he experiences pain continuously. He also testified that he is unable to work, can no longer engage in sex, can no longer participate in recreational activities, such as swimming or horseback riding, can sit for only twenty minutes, and can stand for only thirty minutes at a time without discomfort.

### II. PROCEDURAL BACKGROUND

On September 5, 1989, Montalvo filed a negligence action against the City and Lapez. The City eventually admitted liability for the accident but contested the amount of damages legally caused by its negligence.

Earlier, on June 20, 1989, Montalvo had filed suit against Makekau and Makekau's employer, seeking damages arising from the 1987 Makekau accident. On a motion for summary judgment, the trial court ruled that Makekau was negligent, leaving for trial the issue of damages. The circuit court consolidated the City and the Makekau suits for trial to apportion damages. Trial was to commence on November 5, 1993. However, on the eve of trial, the Makekau suit was settled; thus, trial proceeded against the City. The trial court instructed the jury as follows:

> In this case, the defendants have admitted that they were at fault for the November 29, 1988 accident. Therefore, the only question for you to decide is what are the injuries and damages legally caused by the [1988 City refuse truck] accident, and, in addition thereto, the nature and extent of such injuries and damages.

Instruction No. 10.

Prior to trial, the court granted the City's motion in limine to exclude Montalvo's expert's testimony regarding hedonic damages, which denial forms the basis of Montalvo's cross-appeal.

On November 13, 1993, the jury awarded Montalvo $170,000.00 in special damages and $600,000.00 in general damages. After the trial court denied its motion for new trial, or in the alternative, for remittitur, the City appealed.

### III. DISCUSSION

#### A. The City's Appeal

The City contends that the trial court committed eight errors:[3] (1) failing to instruct the jury on contributory negligence; (2) failing to instruct the jury on legal causation; (3) restricting the scope of the special verdict form, and in turn, restricting the jury's consideration of the issue of apportionment; (4) rejecting the City's request for special interrogatories on the verdict form regarding apportionment of damages for past injuries; (5)

---

**3.** We list and discuss the City's points of error in a different order than raised in the City's brief.

failing to instruct the jury that "the City was not liable for the [November 11, 1991] back surgery or later found injury if it was caused by Montalvo's negligence, or only partially liable if found only partially at fault for the injury.... By doing so, the court did not permit apportionment for subsequent incidents and injuries"; (6) instructing the jury regarding the City's liability for alleged "negligent medical or hospital treatment or care"; (7) admitting into evidence extensive documentation concerning Montalvo's failed business venture; and (8) denying the City's request for remittitur or new trial. We address each contention in turn.[4]

## 1. Contributory Negligence Instructions

■ The City asserts that the trial court erred when it refused, over its objection, to give the following pattern court jury instructions on contributory negligence:

In this case, in addition to denying that any negligence on its part legally caused injury to the plaintiff, the defendants claim that the plaintiff himself was negligent and that plaintiff's own negligence was a legal cause of the plaintiffs' injuries. Where a plaintiff's own negligence is a legal cause of his injury, this is called "contributory negligence."

The burden is on the defendants to prove by a preponderance of the evidence any contributory negligence on the part of the plaintiff.

Instruction No. 26.

In this case, the plaintiff is suing the defendant for injuries resulting from the accident of November 29, 1988.

The jury must determine whether any of the parties in this case were negligent and whether such negligence on the part of a party was a legal cause of the plaintiff's injuries. If you find that the defendant's negligence was a legal cause of the plaintiff's injuries, you must determine the total amount of compensation to said plaintiff due to the injuries suffered, whether or not you find that the plaintiff's own negligence was also a legal cause of his injuries. In the event you find that both defendants

and plaintiff were negligent, and that the negligence of each was a legal cause of the injuries, you must determine the degree to which the negligence of each party contributed to the injuries, in terms of percentages.

Instruction No. 27.

"Jury instructions ... must be considered as a whole. Moreover, a refusal to give an instruction that correctly states the law is not error if another expressing a substantially similar principle is given." *State v. Pioneer Mill Co., Ltd.*, 64 Haw. 168, 180, 637 P.2d 1131, 1140 (1981) (citations omitted) (internal quotation marks omitted).

The City argues that by failing to instruct the jury on contributory negligence, the court precluded the jury from properly considering incidents occurring after the 1988 City accident, which allegedly aggravated Montalvo's condition. The City reasons that Montalvo caused some of his own injuries by participating, against the advice of his doctors, in activities such as boogie-boarding, pushing his car, and riding in a deep sea fishing vessel. In support, the City cites *Gibo v. City & County of Honolulu*, 51 Haw. 299, 459 P.2d 198 (1969). In *Gibo*, the plaintiff slipped and fell at a City-maintained hospital, breaking a kneecap. Plaintiff underwent surgery and, while recovering at home, reinjured his knee when he tripped while on crutches. This court addressed the issue "whether the trial judge adequately instructed the jury on the question of liability as to the injuries and damages that resulted from the second fall." *Id.* at 302, 459 P.2d at 200.

We noted in *Gibo* that "where a defendant's negligence causes injuries to a plaintiff and[,] because of the weakened or impaired physical condition[,] plaintiff suffers subsequent injuries, which are not brought about by the negligence of plaintiff, or any efficient intervening cause, defendant's negligence is deemed to be the proximate cause of both the original and subsequent injuries." *Id.* (citations omitted). We stressed, however, that:

---

4. Because we are remanding this case for a new trial, we need not address whether the trial court

abused its discretion in denying the City's motion for new trial, or in the alternative, for remittitur.

[w]here plaintiff's subsequent injuries are brought about by plaintiff's negligence, defendant is only liable for the original injuries, as proximate cause of defendant's negligence. This result may be reached under the theory of avoidable consequences, that is, plaintiff by the use of reasonable care could have avoided the subsequent fall and the injuries and damages that resulted. Or under the doctrine that the negligence of defendant was not the proximate cause of the second fall and the consequent injuries and damages because the negligence of plaintiff was an efficient intervening cause.

*Id.* at 302–03, 459 P.2d at 201 (citations omitted).

Although *Gibo* is applicable to the instant case, the City's argument is misplaced. In the context of this case, contributory negligence, as defined in the pattern instructions quoted earlier, is inapplicable. The City admitted that it was negligent in causing the 1988 accident; no party contended at trial that Montalvo was in any way contributorily negligent in causing the City accident. Neither did anyone argue that the 1988 City accident proximately or legally caused [5] Montalvo's subsequent incidents (*e.g.,* having to push his vehicle off the road).

More importantly, although the trial court refused the pattern contributory negligence instructions, it gave the City's instruction No. 6, which reads as follows:

Plaintiff has the duty to use reasonable care and diligence to avoid loss, and to minimize the damages, and to use reasonable means to prevent the aggravation of such damages.

If Plaintiff does not use reasonable care and diligence to avoid loss and to minimize damages, he may not recover for that portion of the damages which could have been prevented had he used reasonable efforts or made reasonable expenditures. The

burden of proof on this issue is on Defendants.

This instruction is consistent with *Gibo,* correctly states the law, and properly presents to the jury the question whether Montalvo legally caused any of his own injuries after the 1988 City accident. The first part of the City's instruction No. 6 describes the plaintiff's duty to mitigate damages, described in *Gibo* as the doctrine of "avoidable consequences." The second part describes the consequences to the plaintiff and allows for apportionment. Thus, we conclude that the trial court did not err in refusing the proffered pattern instructions on contributory negligence.

### 2. Instructions Relating to Legal Causation

The City contends that the trial court erred in failing to define the term "legal causation" for the jury. At trial, the City had requested a standard pattern instruction defining legal causation but withdrew it,[6] submitting instead a proposed instruction taken from *Mitchell v. Branch and Hardy,* 45 Haw. 128, 131, 363 P.2d 969, 973 (1961). The proposed instruction stated in part:

To impose liability on a negligent party for an injury to another, there must be a causal connection between the negligent act and the injury.... The injury must be the result of, or flow from, the negligent act before the negligent party is held liable.

Defendants' [City's] Instruction No. 3 [hereinafter, the *Mitchell* instruction].

The court refused the *Mitchell* instruction. However, the court gave no instruction defining "legal cause" even though it had instructed the jury that "the only question for you to decide is what are the injuries and damages *legally caused* by the accident and the amount to award for such injuries and damages." (Emphasis added.)

---

5. For our purposes, the terms "legal cause" and "proximate cause" are synonymous, although courts should use "legal cause" instead of "proximate cause" when instructing juries. *See Knodle v. Waikiki Gateway Hotel,* 69 Haw. 376, 389, 742 P.2d 377, 386 (1987).

6. The pertinent pattern instruction stated in part: "An act or omission is a legal cause of an injury/damage if it was a substantial factor in bringing about the injury/damage."

In its brief, the City argues that "the court committed error when it refused to give a proximate or legal cause instruction based upon [*Mitchell* ]." The City also noted in its brief and at oral argument that "under the plain error doctrine, it was fatal for the [c]ourt to fail to offer *any* legal cause instruction at all." (Emphasis in original.) Therefore, we address two issues: (1) whether the court committed reversible error in refusing the *Mitchell* instruction, and, if not, (2) whether the court nevertheless committed plain error in not defining "legal cause" for the jury.

In analyzing these two issues, we note that Hawai'i Rules of Civil Procedure (HRCP) Rule 51(e) (1991) provides in part:

> no party may assign as error the giving or refusal to give, or the modification of, an instruction ... unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.

However, "even the complete failure to object to a jury instruction does not prevent an appellate court from taking cognizance of the trial court's error if the error is plain and may result in a miscarriage of justice." *Turner v. Willis,* 59 Haw. 319, 324, 582 P.2d 710, 714 (1978) (citations omitted); *Chung v. Kaonohi Center Co.,* 62 Haw. 594, 603, 618 P.2d 283, 290 (1980).

### a. The Mitchell Instruction

■ Given the preceding standards, if the proposed *Mitchell* instruction incorrectly stated the law, the court properly refused to give it. Alternatively, if the City did not properly object, under HRCP 51(e) and absent plain error, the City is precluded from assigning error.

The record reflects that the City objected to the court's refusal to give the *Mitchell* instruction as follows:

> Your Honor, this goes to *the same argument we made earlier* with respect to the negligence on the part of Mr. Montalvo subsequent to ou[r] accident. And that on the basis of Doctor Lipp and Doctor Nakano, they both said that surgery was not required as late as October of 1991. And

there were subsequent incidents. . . . which may have aggravated or caused his condition to become worse and possibly even caused his need for the back surgery.

(Emphasis added.) The "same argument we made earlier" refers to a discussion regarding the proffered contributory negligence instructions; thus, it appears that the City was concerned about the lack of an instruction on contributory negligence—not about an inadequate explanation of "legal causation." The proposed *Mitchell* instruction had little, if anything, to do with contributory negligence. Nothing in the record indicates that the City objected to the refusal to give the *Mitchell* instruction on the ground that the court was not explaining "legal causation." The objection cited above was, at best, an oblique reference to a lack of explanation of causation and should have been more precise. *Cf.,* 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2554 (1971) ("[t]he grounds must be stated with sufficient clarity that the trial judge may see what they are and follow them if well taken. . . . [O]bjections to a charge must be sufficiently specific to bring into focus the precise nature of the alleged error.").

Furthermore, even if the objection was sufficient, the proposed *Mitchell* instruction incorrectly defines proximate or legal cause. In the proposed instruction (and in its brief and at oral argument), the City quoted and stressed the language from *Mitchell* that "[t]he injury must be the *result of, or flow from,* the negligent act[.]" *Mitchell,* 45 Haw. at 131, 363 P.2d at 973 (emphasis added). This language, the City argues, would have helped the jury understand the concept of "legal cause." However, three paragraphs following the quoted portion, the *Mitchell* court stated:

> The best definition and the most workable test of proximate or legal cause so far suggested seems to be this: "The actor's negligent conduct is a legal cause of harm to another if (a) his conduct is a *substantial factor* in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm."

*Id.* at 132, 363 P.2d at 973 (citing *Restatement of Torts,* § 431 and *Prosser on Torts,* § 47) (emphasis added); *see Knodle,* 69 Haw. at 390, 742 P.2d at 186 (reaffirming that *Mitchell* correctly adopted the "substantial factor" definition).

Courts have long grappled with the concept of proximate or legal cause. "There is perhaps nothing in the entire field of law which has called forth more disagreement, or upon which opinions are in such a welter of confusion." *Knodle,* 69 Haw. at 389 n. 9, 742 P.2d at 385 n. 9 (quoting *Prosser and Keeton on the Law of Torts,* § 41 at 263 (1984)). The "[substantial factor] formula is not without critics ... [b]ut we are convinced that 'substantial factor' is a phrase sufficiently intelligible to furnish an adequate guide in instructions to the jury, and that *it is neither possible nor desirable to reduce it to any lower terms." Id.* at 390, 742 P.2d at 386 (citation omitted) (internal quotation marks omitted) (emphasis added). Thus, although the City correctly cited to *Mitchell* for the definition of "proximate" or "legal" cause, it quoted the wrong language. Under *Knodle,* the language "flow from" would have insufficiently explained legal cause. Consequently, we conclude that the court properly refused the proffered *Mitchell* instruction.

### b. *Plain Error*

We turn now to the question whether the trial court committed plain error in not defining "legal cause" for the jury. Although our appellate courts have not yet addressed this specific issue, other jurisdictions have held that failure to instruct a jury on the meaning of proximate or legal cause, when such issue is in dispute, is plain error requiring reversal.

In *Cline v. Kehs,* 146 Ga.App. 350, 246 S.E.2d 329 (1978), the Georgia Court of Appeals remanded an auto accident negligence case because of inadequate instructions on proximate cause, holding that:

Even though ... matters not requested to be charged when special verdicts are submitted to the jury are waived, this rule obviously does not extend to an element so *essential* as proximate cause in negligence actions. It is basic in our law that no liability attaches unless the negligence alleged is the proximate cause of the injury sustained.... it is essential that the trial judge instruct the jury as to the legal meaning of proximate cause and its application to the facts.

*Id.* at 352, 246 S.E.2d at 331 (emphasis in original).

In *Enyeart v. Swartz,* 218 Neb. 425, 355 N.W.2d 786 (1984) (*Enyeart II*),[7] the Supreme Court of Nebraska also found plain error in failing to instruct a jury on proximate cause. The court held that

[w]hile it may not be error, per se, to fail to give a definition of proximate cause ... if the matter is not an issue, *the failure to give an instruction on the definition of proximate cause where,* as here, *it is one of the principal issues in the case must be considered by the court to be plain error, requiring reversal.*

*Id.* at 427, 355 N.W.2d at 788 (citations omitted) (emphasis added).

Similarly, in *Morris v. Getscher,* 708 F.2d 1306 (8th Cir.1983), applying Iowa law, the Eighth Circuit reversed and remanded a legal malpractice case because of plain error in jury instructions on damages and causation. *Id.* at 1311. Although it is not clear what instruction was given on proximate cause, the appellate court commented that

[b]ecause of the centrality of the requirement that a plaintiff prove proximate cause in a malpractice case and the concommitant [sic] importance of the jury's understanding of this requirement ... we conclude that submitting the case under these instructions constituted plain error seri-

---

7. In *Enyeart v. Swartz,* 213 Neb. 732, 331 N.W.2d 513 (1983) (*Enyeart I*), the Nebraska Supreme Court affirmed a grant of a new trial because of inadequate jury instructions. At trial, no objection was made to the instructions but the court relied on "the long-standing rule that it is the duty of the trial court, whether requested to do so or not, to submit to and properly instructed the jury on all material issues presented by the pleadings and supported by the evidence." *Id.* at 735, 331 N.W.2d at 515–16.

ously affecting the fairness of the malpractice proceeding.

*Id.* at 1311 (citation omitted).

In *Culver v. Bennett,* 588 A.2d 1094 (Del. 1991), the Delaware Supreme Court also reversed an auto accident negligence case based on plain error in jury instructions on proximate cause.[8] The court commented that because "the issue of proximate cause is ordinarily a question of fact to be submitted to the jury, it is not only appropriate but necessary for the trial judge to properly instruct the jury upon that concept." *Id.* at 1098. The court held that giving the improper definition of proximate cause was plain and reversible error. *Id.* at 1099.[9]

Montalvo asserts that defendant's instruction No. 1 (dealing with apportionment),[10] plaintiff's instruction No. 3 (dealing with aggravation),[11] and defendant's instruction No. 6 (dealing with unavoidable consequences),[12] were sufficient to convey the concept of causation to the jury. However, nothing in those instructions defined "legal cause" in terms of "substantial factor," "natural and probable consequence," or anything similar. Here, the jury could have easily and wrongly omitted the element of legal or proximate causation from its deliberations, thus unjustly finding the City liable for damages. *See Dzurik v. Tamura,* 44 Haw. 327, 329, 359 P.2d 164, 165 (1960) ("the causal connection between the negligent act and the injury complained of ... must be shown. Proxi-

mate causation of an injury must be proved and is never presumed" (citations omitted)).

We recognize that, here, the City *withdrew* the correct instruction in favor of the incorrect or insufficient *Mitchell* instruction for purposes of imparting the construct of legal cause. Further, the City compounded its mistake by objecting improperly to the trial court's failure to explain legal cause. Consequently, the City has essentially waived the error on appeal, and, but for plain error, would be unable to obtain a reversal. *See Turner,* 59 Haw. at 324, 582 P.2d at 714.

In *State v. Fox,* 70 Haw. 46, 760 P.2d 670 (1988), this court summarized the criteria for recognizing plain error:

In civil cases, the plain error rule is only invoked when "justice so requires." We have taken three factors into account in deciding whether our discretionary power to notice plain error ought to be exercised in civil cases: (1) whether consideration of the issue not raised at trial requires additional facts; (2) whether its resolution will affect the integrity of the trial court's findings of fact; and (3) whether the issue is of great public import.

*Id.* at 56 n. 2, 760 P.2d at 676 n. 2 (citing *Jorgensen v. Mark Constr., Inc.,* 56 Haw. 466, 476, 540 P.2d 978, 985 (1975) (other citations omitted)). The error here meets each of the three *Fox* factors.

The first factor is based on the tenet that an appellate court should not review an issue

---

8. This case, however, differs somewhat because Delaware has rejected the "substantial factor" test of proximate cause in favor of a "but for" test. *Id.* at 1097. In *Culver,* the trial court's instruction defined proximate cause as a "substantial factor" despite Delaware's different definition.

9. *But cf. Coy v. Simpson Marine Safety Equipment,* 787 F.2d 19 (1st Cir.1986) (failure to define "causation" or instruct on "proximate" or "legal" cause was *not* plain error) (applying New Hampshire law). However, *Coy* was a products liability case where the theories of liability were express and implied warranty and strict liability; "the failure to expound on the definition of 'causation' or to speak in terms of 'proximate' or legal' cause was not an error." *Id.* at 26 (citation omitted). In *Coy,* the instruction would have been confusing. Here, in contrast, proximate or legal cause was directly at issue and an

instruction explaining legal cause was of paramount importance.

10. *See* section III.A.4. *infra.*

11. Plaintiff's instruction No. 3, as modified, stated as follows:

A person who has a condition or disability at the time of an injury is not entitled to recover damages therefor. However, a plaintiff is entitled to recover damages for any aggravation of such pre-existing condition or disability resulting from the injury.

This is true even if the condition or disability made plaintiff more susceptible to the possibility of ill effects than a normally healthy person would have been, and even if a normally healthy person probably would not have suffered any substantial injury.

12. *See* section III.A.1. *supra.*

based upon an undeveloped factual record. *In re Taxes, Hawaiian Land Co.*, 53 Haw. 45, 53, 487 P.2d 1070, 1076 (1971). Here, the record clearly and sufficiently raises the issue whether the "legal cause" of Montalvo's injuries could have been attributed to events other than the 1988 City accident.

The error here also affects the integrity of the jury's findings. Once all the evidence has been presented, it becomes the court's fundamental duty to properly instruct the jury on the law on the precise issues of fact it is to decide.[13] Here, the court failed to define one of the principle issues in the case—"legal cause," a concept foreign to most non-lawyers. As the City argues in its brief, "the City's entire case hinged on what injury was legally caused by the accident."

As for the third factor of the *Fox* test, we deem preserving the integrity of our jury system to be of "great public import." By failing to instruct the jury on the correct meaning of an element so essential as "legal cause," the trial court allowed the jury to base its determination of damages on speculation and conjecture.

The fact that the City withdrew the correct instruction, while unfortunate and misdirected, is not outcome-dispositive. As indicated above, it is the trial judge's duty to ascertain the correctness of the instructions to be submitted to the jury. The goal of preserving the integrity of the jury system far outweighs any argument that a party, who withdraws a crucial instruction, invited the error and that, thus, any adverse verdict against such party should be affirmed as an appropriate sanction. The public's confidence in the jury system obviously will not be enhanced by such a result.

The minority, in its dissent, disagrees with the above analysis, concluding that because the City's "misguided games-playing induced the error in the first place," Minority opinion at 304, 884 P.2d at 367, we should not reward it by recognizing plain error. "Game-play-

ing," in this context, implies a conscious effort to deceive the court and the jury and to reap the benefits of such conduct. There is absolutely no evidence in the record to support the minority's bold conclusion that the City was engaged in "games-playing." The mere submission and withdrawal of a correct instruction of law can only be characterized, at best, as evidence of the lack of knowledge or experience of the attorneys involved.

The minority states that "[t]here can be no doubt that the City [withdrew the correct instruction] because it believed, correctly or incorrectly, that the [*Mitchell*] instruction was *significantly more favorable* to it." The crucial point that the minority misses is the fact that the correct instruction (*substantial factor*) would obviously have been more "favorable" to the City than the incorrect *Mitchell* instruction (*flowing from*) because it would have made more narrow the scope of the jury's consideration of the amount of damages. Without the correct instruction, the jury could only speculate as to what constituted "legal causation," leaving the City vulnerable to unlimited and potentially baseless damages. Had the broader *Mitchell* instruction been given, the result would have been the same. The City's withdrawal of the more favorable, restrictive instruction supports our inference of a lack of knowledge or experience, rather than "games-playing," on the part of the City's attorneys.

 We agree with the minority that "[t]he plain error doctrine represents a departure from the normal rules of waiver that govern appellate review." Minority opinion at 304, 884 P.2d at 367. We also agree that "the plain error doctrine is based on notions of equity and justice." *Id.* at 304, 884 P.2d at 367. However, in concluding that "justice requires that we *not* recognize plain error [in this case]," *id.* at 305, 884 P.2d at 368, the minority simply misses the entire point of our discussion regarding the trial court's failure to define legal cause for the jury. Because legal cause is an element so essential

---

13. *Cf., Briones v. State*, 74 Haw. 442, 472–73, 848 P.2d 966, 980 (1993) ("[T]he trial court is the *sole source* of all definitions and statements of law.... It is the *duty of the circuit judge* to see to it that the case goes to the jury in a clear and intelligent manner, so that they may have a clear and correct understanding of what it is they are to decide, and [the judge] shall state to [the jury] fully the law applicable to the facts.") (Levinson, J., concurring) (citations omitted) (internal quotation marks omitted) (emphasis in original).

and basic in any case premised on negligence, it is crucial that the jury be properly instructed in order for it to perform its duty as judges of the fact.

We agree with the substantial authority from other jurisdictions that where, as here, causation is a primary issue, it is plain and reversible error for a trial court not to explain the meaning of "legal cause" to a jury.

### 3. The Special Verdict Form

■ The City also contends that the trial court unfairly restricted the scope of the jury's deliberation by allowing the submission of a single question on the special verdict form. Quoted in its entirety, the form directed the jury as follows:

The jury must answer the question below. *Each* answer requires the agreement of at least ten (10) jurors; however, the *same* ten (10) jurors need *not* agree on each answer. If you do not understand the question or if you wish to communicate with the Court on any subject, you must do so in writing through the Bailiff.

#### QUESTION

After reduction for apportionment, if any, for any **preexisting** medical condition, what are Plaintiff's damages from the accident of November 29, 1988?

Special Damages: $_____

General Damages: $_____

Sign and date this Special Verdict and notify the Bailiff.

(Underscoring in original.) (Bold emphasis added.)

The City had requested special interrogatories asking the jury to apportion damages (1) attributable to each of Montalvo's major accidents occurring prior to the 1988 City accident, and (2) between the 1988 accident and the post-accident events such as boogie boarding and pushing a car. The trial court rejected all interrogatories, asking only the single question.

The City argues that the form of the single question prevented the jury from considering incidents occurring after the 1988 accident. Focusing on the language, "[a]fter reduction for apportionment, if any, *for any preexisting*

*medical condition,*" the City contends that the question allows only for apportionment of events *prior* to the 1988 accident.

Montalvo counters by arguing that the form allowed for apportionment and that, considering the interrogatory along with all of the jury instructions, the special verdict incorporated and addressed all relevant issues, including consideration of Montalvo's post–1988 incidents.

■ A trial court has "complete discretion" whether to utilize a special or general verdict and to decide on the form of the verdict as well as the interrogatories submitted to the jury "provided that the questions asked are adequate to obtain a jury determination of all factual issues essential to judgment." *In re Hawaii Federal Asbestos Cases,* 871 F.2d 891, 894 (9th Cir.1989); accord 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2505 (1971) [hereinafter, Wright & Miller]; *see also* HRCP 49(a). Although there is "complete discretion" over the type of verdict form, the questions themselves may be so defective that they constitute reversible error. Wright & Miller, *supra,* § 2508.

■ In analyzing alleged errors in special verdict forms, the instructions and the interrogatories on the verdict form are considered as a whole. *See Knodle,* 69 Haw. at 383–84, 742 P.2d at 382–83 ("[T]he judge should explain the law of the case, point out the essentials to be proved on one side or the other, and bring into view the relation of the particular evidence adduced to the particular issues involved. All of this must be done in such a manner that the jury will not be misled.") (citations omitted) (internal quotations and brackets omitted).

As quoted in section III.A.1., *supra,* the trial court instructed the jury on the theory of avoidable consequences and the duty to mitigate. The court also instructed the jury that Montalvo could not recover for "that portion of the damages which could have been prevented had he used reasonable efforts or made reasonable expenditures." However, the verdict form asked a narrow question, restricting apportionment to *preexisting* conditions only. Although the court

instructed the jury regarding recovery for post-accident injuries, the court's verdict form appears to have precluded the jury from apportioning damages for the post-accident events. At minimum, the form contradicted the accompanying instructions and, thus, calls into question the award of damages.

Furthermore, as explained in section III. A.4., *infra*, the instruction regarding apportionment incorrectly set forth the law in this jurisdiction. Even if the interrogatory in the special verdict was not too narrow, the court's accompanying instruction on the key issue of the legal cause of plaintiff's damages was incorrect, thus rendering the verdict form deficient.

We emphasize that the deficiency of the verdict form is not necessarily attributable to the omission of specific interrogatories for each incident in Montalvo's accident history. Rather, by specifically referring to "preexisting conditions," the form excluded consideration of other relevant post–1988 accident events.

#### 4. Apportionment of Damages

The City asserts that the court also precluded the jury from considering incidents occurring after the 1988 City accident by redacting all portions of its proposed instruction No. 1 that referred to incidents after November 29, 1988. The City's instruction No. 1, as modified by the trial court, stated:

> In this case, Plaintiff was suffering from pre-existing medical conditions at the time of the November 29, 1988 accident. You are instructed to determine the apportionment, if any, of the damages, as follows:
>
> (1) You must decide what proportion of such injuries was caused by the November 29, 1988 accident, and what proportion of such injuries was caused by the pre-existing medical condition.
>
> (2) If you are unable to determine how much of Plaintiff's damages can be apportioned to the November 29, 1988 accident and to the pre-existing medical condition, you may make a rough apportionment.
>
> (3) If you are unable to make even a rough apportionment, you must apportion

the damages equally between the pre-existing medical condition and the November 29, 1988 accident.

Both the City and Montalvo objected to the instruction. Montalvo, objecting to subparagraph (3), argued that:

> even as amended, this instruction tells the jury that if they are not able to make either an apportionment or a rough apportionment, they must divide the damages equally.... [However,] [u]nder [*Matsumoto v. Kaku*, 52 Haw. 619 [629], 484 P.2d 147 (1971)], the situation of a single accident going to trial where there are preexisting medical conditions either resulting from a diseased condition or otherwise, we then find that the [s]upreme [c]ourt very specifically said that if they are unable to make either an apportionment or rough apportionment, that the jury should then give one hundred percent of the damages.

On the other hand, the City objected because the court redacted references to post-accident incidents:

> Your Honor, with respect to the City's position, I think as written, it's a correct statement of the law and that the jury should be able to make its own determination based upon not only what happened as of November 29, 1988, as well as what happened prior to November 1988. But the fact that he went boogie boarding, pushed his car off the road to fix a flat tire, went deep sea fishing after the November 29, 1988 accident, he had several incidents where those types of conduct or activity may have contracted or aggravated his medical condition. And therefore, those should [be] considered by the jury.

Therefore, we review the City's instruction No. 1, as revised, in its entirety and examine whether it correctly states the law on apportionment of damages.

Well over twenty years ago, our court set forth Hawai'i's apportionment-of-damages jurisprudence in four opinions—*Kawamoto v. Yasutake*, 49 Haw. 42, 410 P.2d 976 (1966), *Loui v. Oakley*, 50 Haw. 260, 438 P.2d 393 (1968), *Bachran v. Morishige*, 52 Haw. 61, 469 P.2d 808 (1970), and *Matsumoto v. Kaku*, *supra*. "Unfortunately, these opinions have

not resolved all of the uncertainties present in [the areas of apportionment and of expert medical opinion on causation, apportionment, and pain and suffering]." J. Duffy, *Apportionment of Personal Injury Damages and Expert Medical Opinion in Hawaii*, 8 Haw. Bar J. 25 (1971) [hereinafter, Duffy]. "Reconciliation of *Kawamoto, Loui, Bachran,* and *Matsumoto* is not easily accomplished." *Id.* at 30.

Today, we are faced with analyzing the law of apportionment of damages in a situation where a plaintiff (1) has a pre-existing condition, namely, spondylolisthesis, (2) has been injured or his condition has been aggravated by independent acts of successive tortfeasors, and (3) has allegedly caused some of his own injuries after the accident from which he has brought suit. Because of this confluence of relevant factors, this case presents an opportunity for us to comprehensively review and clarify an important area of Hawai'i tort law. To place our discussion of Hawai'i case law in context, we begin with fundamental concepts and distinctions; we then examine and compare principles of the law on apportionment from other jurisdictions.

### a. *Fundamental Principles*

Generally, "a defendant is liable in damages to a plaintiff for all injuries [legally] caused by [the defendant's] negligence." *Gibo v. City & County of Honolulu,* 51 Haw. 299, 302, 459 P.2d 198, 200 (1969). However, it is well settled that "a tortfeasor is liable not only for damages resulting from direct and unique injuries inflicted on the victim, but also for damages resulting from the aggravation of the victim's pre-existing disease, condition, or predisposition to injury." 2 Nates, Kimball et al., *Damages in Tort Actions* § 15.01 at 15–4 (1994) [hereinafter,

*Damages in Tort Actions* ]. Such "predisposition to injury" or other special sensitivity is often involved in the context of the so-called "thin skull" or "eggshell skull" plaintiff.

In *Newbury v. Vogel,* 151 Colo. 520, 379 P.2d 811 (1963), the Colorado Supreme Court stated the general rule for apportioning damages in a pre-existing condition or aggravation-of-condition situation:

> where a pre-existing diseased condition exists, and where[,] after trauma aggravating the condition[,] disability and pain result, and no apportionment of the disability between that caused by the pre-existing condition and that caused by the trauma can be made, in such case, even though a portion of the present and future disability is directly attributable to the pre-existing condition, the defendant, whose act of negligence was the cause of the trauma, is responsible for the entire damage.

*Id.* at 524, 379 P.2d at 813 (citations omitted). The plaintiff in *Newbury,* suffering from a pre-existing arthritic condition, was injured by the defendant in a motor vehicle accident. After the accident, the plaintiff was permanently disabled with a spinal sprain manifested by chronic neck and back pain. At trial, two medical experts testified that it was impossible to apportion the cause of plaintiff's disability between the pre-existing arthritis and the accident. Although the jury was partially instructed on the issue of apportionment, it was not instructed as to the law that would apply if it could not apportion plaintiff's damages. On appeal, the court held that the plaintiff was entitled to an instruction advising the jury that, if it was unable to apportion the disability, the defendant was liable for the entire damages. *Id.*

The *Newbury* rule is well established,[14] and in *Kawamoto v. Yasutake, supra,* this

---

14. *See, e.g., Bigley v. Craven,* 769 P.2d 892, 898 (Wyo.1989) (cervical degenerative disc disease); *McNabb v. Green Real Estate Co.,* 62 Mich.App. 500, 516, 233 N.W.2d 811, 818–20 (1975) ("brittle diabetic"); *Lamoureaux v. Totem Ocean Trailer Exp., Inc.,* 632 P.2d 539, 542 (Alaska 1981) ("thoracic outlet syndrome"); *Haws v. Bullock,* 592 S.W.2d 588, 591 (Tenn.App.1979) (degenerative arthritis and degenerative disc disease in neck and back); *see also Damages in Tort Actions* § 15.34[1][b] ("[s]hould apportionment of damages prove impossible in a pre-existing condition

case, the tortfeasor may be liable for the whole of the plaintiff's injuries.").

In *Brake v. Speed,* 605 So.2d 28 (Miss.1992), the court noted in dictum that the *Newbury* rule is equivalent to the "thin skull" rule:

> one who injures another suffering from a pre-existing condition is liable for the entire damage when no apportionment can be made between the pre-existing condition and the damages caused by the defendant—thus the defendant must take his victim as he finds her. *Id.* at 33.

court adopted *Newbury* as Hawai'i law. In *Kawamoto,* doctors had treated the plaintiff for an arthritic neck at least eight years before the defendant aggravated the plaintiff's pre-existing condition in an automobile accident.

Applying these general principles, however, becomes complicated in multiple tortfeasor situations. "The difficulty which confronts us is that the right to recovery ... is often confused and dependent on the characterization of the tortfeasor as joint, concurrent, or successive." *Phennah v. Shalen,* 28 Wash.App. 19, 22, 621 P.2d 1304, 1306 (1980), *rev. denied,* 95 Wash.2d 1026 (1981).

[C]ourts have looked not to the divisibility of the harm, but to the manner in which the occurrence(s) took place in determining whether tortfeasors are joint, concurrent or successive.... Defendants who were acting together, so as to share a common duty, are joint tortfeasors. Characterized as concurrent tortfeasors have been those defendants, one of whose negligence set forth in motion a series of events upon which the other's [negligence] acted so as to produce the end result. The final category is successive tortfeasors, whose negligent acts are wholly unrelated in time and causation.

. . . .

In the instances of joint or concurrent tortfeasors it is intuitively clear that there can result only one injury. In the case of successive tortfeasors, however, the injuries are inflicted by separate, discrete impacts and it therefore would seem that the plaintiff ought to be able to ascribe to each wrongdoer responsibility for only the damages he caused.

*Id.* at 23–24, 621 P.2d at 1307 (citations omitted).

**15.** *See also Romero v. Parker,* 619 P.2d 89, 90 (Colo.App.1980) (citing *Hylton* ); *Maser v. Fioretti,* 498 So.2d 568, 570 (Fla.App.1986) ("[i]f injuries sustained as a result of a second accident are inseparable from those sustained in an earlier accident, the second tortfeasor may be held liable for all the injuries"); *Bushong v. Kamiah Grain,* 96 Idaho 659, 534 P.2d 1099 (1975) (pre-existing knee condition as a result of motorcycle accident

### b. *"Unrelated" Successive Accidents*

Courts have applied the *Newbury* rule to successive accidents, where the pre-existing condition resulted from a previous accident rather than from a pre-existing disease or congenital condition. In *Hylton v. Wade,* 29 Colo.App. 98, 478 P.2d 690 (1970), the Colorado Court of Appeals, in an action against the second of two tortfeasors, applied the *Newbury* rule where the pre-existing condition resulted from a prior accident for which a recovery had been obtained. The appellate court refused to distinguish a diseased or congenital pre-existing condition from one caused by a prior trauma. Because a *Newbury* instruction was not given, the court reversed and remanded the case for a new trial on damages. *Id.* at 100, 478 P.2d at 691.[15]

Furthermore, where successive tortfeasors are involved, the right to recovery sometimes depends upon which tortfeasor is being sued. In *Bruckman v. Pena,* 29 Colo.App. 357, 487 P.2d 566 (1971), the plaintiff was involved in two unrelated accidents that occurred eleven months apart. The plaintiff brought an action against the driver and owner of a truck involved in the first accident only. At trial, the court correctly instructed the jury that:

Where a subsequent injury occurs which aggravated the condition caused by the collision, it is your duty, if possible, to apportion the amount of disability and pain between that caused by the subsequent injury and that caused by the collision.

*Id.* at 359, 487 P.2d at 567. However, the trial court erroneously instructed the jury:

But if you find that the evidence does not permit such an apportionment, then the Defendants are liable for the entire disability.

*Id.* The jury returned a verdict in favor of plaintiff, and defendants appealed. The *Bruckman* court held that the erroneous in-

twenty-seven years prior to accident at bar); *cf. Phennah,* 28 Wash.App. at 29, 621 P.2d at 1310 (1980) (if the jury is unable to apportion injury between two successive tortfeasors in a trial against both defendants (from two unrelated accidents), the tortfeasors are jointly and severally liable); and *Kleitz v. Baskin,* 103 Nev. 325, 738 P.2d 508, 509 (1987) (same holding as *Phennah* ).

struction "permit[ted] the plaintiffs to recover damages against the defendants for injuries which the plaintiff received subsequent to any act of negligence on the part of the defendants and from causes for which the defendants were in no way responsible." *Id.,* 29 Colo.App. at 360, 487 P.2d at 568. The court, therefore, remanded the case for a new trial on damages.

Taking note of the *Newbury* rule, the *Bruckman* court recognized that "the rules [announced in *Newbury* ] also apply where the pre-existing condition was caused by trauma." *Id.* (citing *Hylton v. Wade, supra* ). However, the court distinguished *Newbury* and *Hylton,* reasoning that:

> it is one thing to hold a tort-feasor who injures one suffering from a pre-existing condition liable for the entire damage when no apportionment between the pre-existing condition and the damage caused by the defendant can be made, but it is quite another thing to say that a tortfeasor is liable, not only for the damages which he caused, but also for injuries subsequently suffered by the injured person. We hold that the defendants here cannot be held liable for the plaintiff's subsequent injury and this is so whether or not such damage can be apportioned between the two injuries.

*Bruckman,* 29 Colo.App. at 361, 487 P.2d at 568.

Thus, given *Newbury* and *Bruckman,* a plaintiff's recovery could differ depending upon which tortfeasor's liability is at issue. "[T]he mere substitution of the second tortfeasor for the first, would have compelled a different result in *Bruckman.*" Comment, *Torts—Apportionment of Damages—Indivisible Injuries,* 49 Den.L.J. 115, 120 (1972) [hereinafter, Comment]. If liability of the first negligent tortfeasor is at issue, and if a jury is unable to apportion damages, under *Newbury* and *Hylton,* the plaintiff recovers fully from the defendant.

The juxtaposition of *Bruckman* with *Hylton* exemplifies the competing policy concerns at issue when apportioning damages in successive tortfeasor situations. On the one hand, in order to recover damages, a plaintiff has the burden of proving that the damages were legally caused by a defendant's negligence. *See, e.g., Gibo v. City & County of Honolulu, supra.* When damages cannot be apportioned, holding the original tortfeasor liable for injuries caused by subsequent incidents unfairly holds the tortfeasor liable for a portion of damages that the tortfeasor did not cause. *See Bruckman,* 29 Colo.App. at 361, 487 P.2d at 568. On the other hand, the *Bruckman* result has been criticized because a plaintiff may recover nothing even though the defendant is negligent, merely because the jury is unable to apportion damages among successive tortfeasors. *See, e.g.,* Comment, *supra,* at 119–120; W. Keeton et al., *Prosser and Keeton on Torts* § 52, at 350 n. 53 (5th ed.1984) [hereinafter, Prosser].

### c. *"Related" Successive Accidents*

Courts have also recognized that the *Bruckman* rule should not apply if a subsequent injury is legally caused by a previous injury; that is, if an injury legally causes subsequent accidents and injuries, then the tortfeasor causing the first injury can be liable for the subsequent injuries if a jury cannot apportion the damages among the successive tortfeasors. *See, e.g., Hashimoto v. Marathon Pipe Line,* 767 P.2d 158 (Wyo. 1989).

*Hashimoto* involved a trial against the first of two tortfeasors (the second tortfeasor settled before trial). The trial court instructed the jury that the plaintiff had to prove to a "reasonable certainty" that his damages were caused by the first tortfeasor and not the second. Dissatisfied with the jury's award, plaintiffs appealed. On appeal, plaintiffs argued that the defendants (once determined to be negligent) had the burden of apportioning damages; and if the jury was unable to apportion, then the defendants would be liable for all damages. The Wyoming Supreme Court disagreed. Relying on *Bruckman,* the court reasoned that

> [t]he ultimate injuries were caused by the second collision which is a distinct intervening cause because the first injuries had stabilized. Consequently, it would be inappropriate to hold [the first tortfeasor] liable for the entire damage when no correla-

tion between the two accidents was shown.... [T]he first injuries were not the proximate cause of the second accident. *Id.* at 161; *see also Alexander v. White*, 488 P.2d 1120 (Colo.App.1971) (in suit against first of two tortfeasors, court found second injury was not related to first and, thus, first tortfeasor not liable for subsequent injuries); *Barkley v. Freeman*, 16 Kan.App.2d 575, 583, 827 P.2d 774, 779 (1992) (in suit against first tortfeasor, second accident not a reasonably foreseeable result of first accident); Prosser, *supra*, § 52, at 352 ("there are situations in which the earlier wrongdoer will be liable for the entire damage, but the latter one will not" [such as where the earlier accident legally causes a second accident.]). In these jurisdictions, the burden of proof to show the connection between the injuries is on the plaintiff; and if the plaintiff fails to meet the burden, the plaintiff recovers nothing.

d. *Hawai'i Case Law*

■ With this background, the importance of this court's seminal decision in *Loui v. Oakley*, *supra*, becomes clear. In *Loui*, decided only two years after *Kawamoto*, we faced similar facts as did the *Bruckman* court. The plaintiff in *Loui* was injured in an automobile accident, but before reaching trial, she was involved in three additional unrelated accidents. In each accident, the plaintiff injured the same area of her body. *Loui*, 50 Haw. at 260, 438 P.2d at 395. We held that the trial court erred in instructing the jury that, if it could not apportion the damages, the defendant would be liable for the damages from all four accidents. *Id.* at 261, 438 P.2d at 395. Justice Bernard H. Levinson, noting the competing policy concerns, wrote that "[i]n deciding this case, we must steer a careful course between the Scylla of denying the plaintiff any remedy and the Charybdis of imposing on one defendant all the damages, at least some of which would not have occurred without the independent acts of other persons." *Id.* at 263–64, 438 P.2d at 396.

Therefore, this court held that

the proper procedure is for the trial court to instruct the jury that if it is unable to determine by a preponderance of the evidence how much of the plaintiff's damages can be attributed to the defendant's negligence, it may make a rough apportionment....

The trial court should instruct the jury that if it is unable to make even a rough apportionment, it must apportion the damages equally among the various accidents....

In apportioning the damages, each accident must be considered, regardless of the possibility that the plaintiff may be unable to recover from persons involved in the other accidents because of the statute of limitations or contributory negligence.

*Id.* at 264–65, 438 P.2d at 396–397.

Two years later, in *Bachran v. Morishige*, *supra*, we were faced with reconciling *Loui* and *Kawamoto*. In *Bachran*, the plaintiff suffered a degenerated cervical disc as a result of two unrelated accidents in 1962 and 1964. *Bachran*, 52 Haw. at 63, 469 P.2d at 810. At the trial against the second tortfeasor (who allegedly caused the 1964 accident), a doctor testified that the plaintiff's degenerated disc was caused by both the 1962 and 1964 accidents. The plaintiff was awarded damages, and the defendant appealed. On appeal, the defendant contended that, under *Loui*, the damages should be apportioned between the 1962 and 1964 accidents. On the other hand, the plaintiff contended that, under *Kawamoto*, the defendant was liable for the entire damages.

We noted in *Bachran* that "[a]t first glance, [*Loui* and *Kawamoto*] may seem to enunciate two different divergent and contradictory rules of law. However, ... [*Loui*] does not overrule [*Kawamoto*]." *Id.*, 52 Haw. at 65, 469 P.2d at 811. We reasoned as follows:

The defendant cites [*Loui*] and argues that as the plaintiff suffered neck and back injuries in both the 1962 and 1964 accidents, the damages suffered by the plaintiff should be apportioned. This contention would be sound providing that in 1964, when the defendant's negligence injured the plaintiff, she was *still suffering* pain and disability from injuries she received in the 1962 accident.

On the other hand, if the plaintiff had *fully recovered* and was suffering no pain or disability from injuries she received in the 1962 accident, all the injuries and damages suffered by the plaintiff would be the proximate result of the 1964 accident and there should be no apportionment. [*Loui*] does not require apportionment in such circumstances.

We believe a fair rule is to hold that where a person has suffered injuries in a prior accident and has fully recovered, and later he is injured by the negligence of another person and the injuries suffered in the later accident bring on pain, suffering and disability, the proximate cause of the pain, suffering and disability is the negligence of that other person. In such circumstances that other person should be liable for the entire damages.

*Id.* (citation omitted) (emphasis added). Whether a person is "fully recovered" or "still suffering pain or disability" is a factual question for the jury. *Id.* at 66, 469 P.2d at 811. Thus, because the trial judge failed to submit the question to the jury, we remanded for a new trial. *Id.*

A year later, we decided *Matsumoto v. Kaku, supra.* The plaintiff in *Matsumoto* was suffering from back pains caused by "lifting trash cans and possibly from Karate exercises." *Matsumoto*, 52 Haw. at 630, 484 P.2d at 149. The defendant then injured the plaintiff in an automobile accident and aggravated the plaintiff's back condition. At trial, physicians testified that it was impossible to apportion the injuries. The trial court held the defendant liable for the total damages, including the aggravation of the pre-existing back condition, and the defendant appealed.

On appeal, this court affirmed. Although recognizing the *Kawamoto, Loui,* and *Bachran* line of case law, the court distinguished *Loui* and *Bachran,* reasoning that: in *Bachran* the record showed that the plaintiff had suffered prior injuries in another automobile collision involving independent acts of a third party; however the action was against the driver of the automobile involved in the second collision.

Here, the uncontroverted evidence is that the plaintiff's pre-existing condition (back pains) was not brought about by transaction or action involving any other person.... Thus, we are not faced with the problem of imposing on the defendant all of the damages, "at least some of which would not have occurred without the independent acts of other person." *Loui v. Oakley,* [50 Haw. at 263–64, 438 P.2d at 396]. We believe this factor distinguishes this case from both *Loui* and *Bachran.*

*Matsumoto*, 52 Haw. at 632, 484 P.2d at 150. The court then extended the *Kawamoto* rule, stating that "[w]e cannot see any realistic reason for differentiating and classifying the pre-existing condition as to whether it was brought about by disease or by some exterior force or influence." *Id.* at 633, 484 P.2d at 150.

Justice Levinson—the author of the *Loui* opinion—dissented in *Matsumoto.* Relying on the logic expressed in *Bachran* and *Loui,* Justice Levinson opined that the court should remand for a new trial to apportion damages. He stressed that

[i]n *Bachran* the plaintiff had *fully recovered* from injuries sustained in a prior accident and her latent condition was reactivated by the negligent acts of the defendant.... In *Bachran* the plaintiff's condition was dormant.... Thus, in the absence of the defendant's act of negligence the plaintiff would not have incurred any medical expenses or suffering at all. The defendant was properly held to be liable for the entire damages.

*Id.* at 635, 484 P.2d at 151 (Levinson, J., dissenting) (emphasis in original). He also noted that *Bachran* emphasized that "[i]f the plaintiff had not fully recovered from the injuries she suffered in the 1962 accident and in 1964 she was still experiencing pain and suffering ... [t]hen *Loui v. Oakley, supra,* ... would be applicable and the damages should be apportioned." *Id.* 52 Haw. at 635–36, 484 P.2d at 151 (quoting *Bachran* ).

Justice Levinson reasoned that the dictum in *Bachran* described the very situation at bar in *Matsumoto,* and thus concluded that *Loui* required an apportionment.

In the present case it is undisputed that at the time of the collision the plaintiff was

still experiencing pain and suffering from back pains brought about by his lifting trash cans and possibly from engaging in Karate exercises. He was also receiving medical treatment for these disabilities. The question to be answered is whether the defendant should be held liable for the entire damages, including payment for medical expenses the plaintiff would have incurred even if the accident had not occurred. I believe such a result would be unjust.

*Id.* at 636, 484 P.2d at 151–52. He went on to stress that

> [n]or should it matter ... that in [*Loui* ] the plaintiff's injuries were caused by third parties while in the instant case they are "self-inflicted." *The real issue is whether the plaintiff was suffering from and receiving treatment for injuries arising prior to the defendant's acts. The policy to be upheld is that the defendant should not be made to pay for injuries he did not cause.* The source of the unrelated injuries is immaterial.

*Id.* at 636, 484 P.2d at 152 (emphasis added). Thus, Justice Levinson would have remanded the case for apportionment, with the instruction that, if the jury were unable to apportion, "damages must be distributed equally among the various accidents." *Id.* at 637, 484 P.2d at 152.

Today, twenty-three years after *Matsumoto,* we again face the same issue and now adopt the reasoning of Justice Levinson's dissent; to the extent that our ruling today is inconsistent with the majority opinion in *Matsumoto,* we overrule it. The majority opinion in *Matsumoto* unfairly holds a "defendant responsible for a certain portion of the total damages suffered by plaintiff which were not attributable to the negligence of the defendant, a proposition contrary to the philosophy of *Loui* and *Bachran* and adverse to the concept of fairness implicit in the fault theory of liability." Duffy, *supra,* at 28.

■ As noted previously, the determination whether a plaintiff has "fully recovered" from a pre-existing condition or injury or whether such condition was "dormant" or "latent" is a question of fact for which medical testimony is especially appropriate.[16] *Bachran,* 52 Haw. at 66, 469 P.2d at 811.

Applying the law to the facts of this case is complicated because of the mix of variables involved: (1) a pre-existing condition; (2) prior unrelated accidents; and (3) alleged post-accident incidents of aggravation of the same injuries. The threshold question whether Montalvo had fully recovered from his pre-existing condition or whether it was dormant or latent at the time of the City accident was not submitted to the jury. Further, because of the restrictive nature of the special verdict form, the post-accident events, which allegedly aggravated his injuries, were also not correctly submitted to the jury.[17]

16. This does not mean, however, that a defendant is responsible for the pre-existing condition. Rather, the defendant is liable for aggravation of the condition.
> Under this rule, sometimes referred to as the "thin skull" doctrine, the fact that the harm suffered by the victim exceeds the harm that one would reasonably have expected a normal person to suffer does not defeat liability or prevent the defendant's conduct from being a cause of the injury.... In essence, the "take him as you find him" rule simply means that the extent of the victim's actual injury from the accident need not have been reasonably foreseeable.

J. King, *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences,* 90 Yale L.J. 1353, 1361 (1981).

17. We realize that the City submitted instruction No. 1. Thus, if the instruction incorrectly states the law (other than as modified by the trial court), under the "invited error" doctrine, the City should be precluded from obtaining a reversal. *See, e.g., Kealoha v. Tanaka,* 45 Haw. 457, 462, 370 P.2d 468, 471 (1962); *State v. Batson,* 73 Haw. 236, 246–47, 831 P.2d 924, 930–31, *reconsideration denied,* 73 Haw. 625, 834 P.2d 1315 (1992). However, the "invited error" doctrine is not applicable here for three reasons: (1) the case is already being remanded because of other errors, *see Knodle,* 69 Haw. at 391, 742 P.2d at 386 ("[i]n view of the impending retrial of the case, we discuss [other] errors as well"); (2) because the City has questioned the form of the verdict, HRCP 49(a) requires us to review the instructions in their entirety, thus calling into question the entirety of instruction No. 1; and (3) Montalvo also failed to submit an instruction that correctly asked the jury to determine, as a threshold matter, whether his injuries had stabilized at the time of the 1988 City accident. Furthermore, Montalvo objected to the instruction at the trial level; however, he did not raise the error in his cross-appeal.

On remand, the jury should be carefully instructed to first determine whether Montalvo had fully recovered from any pre-existing condition or whether such condition was dormant or latent as of November 29, 1988. If the answer is "yes" to any of the above inquiries, then the City is liable for all damages legally caused by the November 29, 1988 City accident. However, if Montalvo's pre-existing condition was not fully resolved or not dormant or latent at the time of the City accident, then the jury must apportion. If the jury is unable to apportion, even roughly, then it must divide the damages equally among the various causes.

The jury must deal with the post-accident incidents separately. The City cannot be held fully liable for damages caused by subsequent incidents (unless the City accident was the legal cause of the subsequent incidents). Thus, if the jury determines that the subsequent incidents and resulting injuries were not caused by the City accident, then the jury must apportion pursuant to *Loui* and the dissent in *Matsumoto*.

### 5. Medical Malfeasance Instruction

The trial court instructed the jury that:
If you find that the defendants are liable for an injury to the plaintiff, they are also liable for any aggravation of such injury or additional injury caused by negligent medical or hospital treatment or case of such injury.

Montalvo's Instruction No. 4. The City contends that the instruction was unwarranted and confusing.

Instruction No. 4 states the black-letter law that negligent medical treatment is a foreseeable result of an injury. If an injury was legally caused by a defendant's negligence, the defendant can be held liable for subsequent negligent medical treatment for such injury (absent an intervening cause). *See* Prosser, *supra,* § 52, at 352 ("an original

wrongdoer may be liable for the additional harm inflicted by the negligent treatment of the victim by a physician"); *see also Gibo,* 51 Haw. at 302, 459 P.2d at 200 ("where a defendant's negligence causes injuries to a plaintiff and[,] because of the weakened or impaired physical condition[,] plaintiff suffers subsequent injuries, which are not brought about by the negligence of the plaintiff, or any efficient intervening cause, defendant's negligence is deemed to be the proximate cause of both the original and subsequent injuries.").

At trial, the City objected to instruction No. 4 on the ground that "it unduly confuses the jury . . . because there's no showing that there was in fact any negligence on the part of the doctors in their treatment of Mr. Montalvo."

Montalvo argues that the surgery was unnecessary and, apparently, that he underwent it based upon erroneous medical advice.[18] If, on retrial, the trial court determines that the evidence is sufficient to support this theory, then instruction No. 4 would be applicable because the erroneous diagnosis, resulting in the subsequent surgery, would have been a related "accident" that would not be apportionable.

### 6. Evidence of Montalvo's Seafood Business

At trial, Montalvo presented extensive evidence about his attempts to establish a seafood and agricultural business subsequent to the City accident. Among other evidence, he offered licenses, letters, and contracts, containing detailed figures of expected imports and revenues. The evidence was clearly probative of Montalvo's fitness to work, a relevant consideration.

However, the City claims that the trial court erred in admitting the evidence because the jury might have misinterpreted the evidence to represent lost earnings, thus in-

---

18. In his brief, Montalvo contends that the City's expert witness, Dr. Nakano, testified he would not have recommended that Montalvo undergo back surgery because there were no neurologic or orthopedic findings to justify it. According to Montalvo, Dr. Nakano opined that Montalvo should have been examined by three separate orthopedic surgeons before he underwent the back surgery. Montalvo also points out that the City elicited testimony from Dr. Lipp that, in October 1990, he (Dr. Lipp) did not feel that Montalvo's symptomatology justified back surgery.

flating the special damages award. The City contends that, under Hawai'i Rules of Evidence (HRE) Rule 403,[19] the trial court should have excluded such evidence.

"[T]he determination of the admissibility of relevant evidence under HRE 403 is eminently suited to the trial court's exercise of its discretion because it requires a 'cost-benefit calculus' and a 'delicate balance between probative value and prejudicial effect.'" *Kealoha v. County of Hawai'i,* 74 Haw. 308, 315, 844 P.2d 670, 674, *reconsideration denied,* 74 Haw. 650, 847 P.2d 263 (1993) (citations omitted).

We note that the trial court gave the following limiting instruction proposed by the City:

The plaintiff has introduced into evidence various documents pertaining to his seafood business to show that he was capable of employment; these documents are not to be considered for any claims for past, present or future loss of income from such business.

"As a rule, juries are presumed to be reasonable and follow all of the trial court's instructions." *Myers v. South Seas Corp.,* 76 Hawai'i 161, 165, 871 P.2d 1231, 1235 (1994). We believe the limiting instruction sufficiently dispelled possible juror confusion. Moreover, Montalvo testified that he did not make money on his .business venture, and that he was not seeking lost income based on it. Thus, given the discretionary standard of review, we find no error in the court's admis-

sion of evidence regarding Montalvo's seafood business.

### B. *Montalvo's Cross–Appeal*

■ Because we are remanding this case to the trial court, we address the merits of Montalvo's cross-appeal. Montalvo contends that the trial court erred in excluding expert testimony on hedonic (or loss of enjoyment of life) damages. Whether expert testimony should be admitted at trial rests within the sound discretion of the trial court and will not be overturned unless there is a clear abuse of discretion. *State v. Montalbo,* 73 Haw. 130, 140–41, 828 P.2d 1274, 1281 (1992).

■ We note first that, indisputably, hedonic damages are recoverable. HRS § 663–8.5(a) (Supp.1992) provides that "[n]oneconomic damages which are recoverable in tort actions include damages for pain and suffering, mental anguish, disfigurement, *loss of enjoyment of life,* loss of consortium, and all other nonpecuniary losses or claims" (emphasis added). Thus, the important issue-of-first-impression we face is strictly whether the trial court abused its discretion in excluding expert testimony on such damages. "The question of admissibility of expert testimony on how the value of [hedonic] damages is calculated is the focus of controversy and debate. Decisions continue to go both ways." T. Branch, *Seeking Recovery for Loss of Enjoyment of Life,* Trial, April 1994, at 40, 43 [hereinafter, Branch, *Seeking Recovery* ].

HRE 702 [20] and 703 [21] govern expert testimony. Under these rules, a court applies the

---

**19.** HRE 403 states:

**Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**20.** HRE 702 provides:

**Testimony of expert witnesses.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the

trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

**21.** HRE 703 provides:

**Bases of opinion testimony by experts.** The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court may, however, disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

following factors in deciding whether to admit such testimony:

[A] court should weigh general acceptance along with the other factors listed below in order to determine, under [HRE] Rules 702 and 703, whether scientific evidence should be admitted at trial. These factors include whether:

1) the evidence will assist the trier of fact to understand the evidence or to determine a fact in issue;

2) the evidence will add to the common understanding of the jury;

3) the underlying theory is generally accepted as valid;

4) the procedures used are generally accepted as reliable if performed properly;

5) the procedure were applied and conducted properly in the present instance.

The court should then consider whether admitting such evidence will be more probative than prejudicial.

*Montalbo*, 73 Haw. at 140, 828 P.2d at 1280–81 (citations omitted).

At trial, Montalvo offered the testimony of Dr. Louis Rose, a professor of economics at the University of Hawai'i, who testified as an expert on lost wages. Additionally, Montalvo made a lengthy offer of proof on Rose's proposed testimony regarding hedonic damages. Montalvo argued, in part:

Doctor Rose would be testifying that based upon the article in Exhibit 99,[22] it is a standard to rely upon that article [in] the economic community. And therefore, hedonic damages are not speculative. It's based upon more than 40 studies as far as the value of life which is based upon people taking riskier jobs, no greater amounts of pay, safety factors such as what people are willing to pay for airbags and things of that nature.

Doctor Rose would be testifying that in this particular case, Mr. Montalvo, based upon his life expectancy of [75.7] years, would have a certain loss based upon the date of the accident in 1988 until the time he died at age 77 and-a-half [sic] ...

. . . .

... [T]he jury would then be able, based upon the expected hedonic loss of [$1,700,000], to life's end to decide what amount should be awarded for hedonic damages. And that would be used as a guide for the jury to give them some figure upon which they would base that part of the damages, which is better than just picking a number out of the air.

Montalvo also noted that Rose's theory of estimating hedonic damages was based on "(1) [w]orker's wages for risk of death, (2) [c]onsumer expenditures on safety, and (3) [s]urvey questionnaires."

"Perhaps surprising to some, the development of methodologies to place a value on human life is not a new science.... [Economists] have come up with two basic approaches for valuing human life: the human capital approach and the willingness-to-pay approach." A. McClurg, *It's a Wonderful Life: The Case for Hedonic Damages in Wrongful Death Cases*, 66 Notre Dame L.Rev. 57, 100 (1990) [hereinafter, McClurg, *It's a Wonderful Life* ]. "[T]he willingness-to-pay approach studies people's consumption behavior to determine how much they are willing to pay to reduce the possibility of dying. The theory is that the amount people are willing to pay for lifesaving products like smoke alarms or automobile safety devices shows what dollar value people place on life." Branch, *Seeking Recovery, supra*, at 42; *see also* McClurg, *It's a Wonderful Life, supra*, at 102–06. Based on Montalvo's offer of proof and his citation to Miller, *Willingness to Pay, supra*, Rose's proffered expert testimony clearly was based on the willingness-to-pay approach discussed in the McClurg and Branch articles.

Recent decisions, however, have specifically rejected expert testimony on hedonic dam-

22. Exhibit 99 was not admitted into evidence and, in fact, the record indicates that it was withdrawn. However, it is described on the exhibit list as "Dr. Louis Rose's figures and articles." We presume one of the articles was Miller, *Willingness to Pay Comes of Age: Will the System Survive?*, 83 Nw.U.L.Rev. 876 (1989) [hereinafter, Miller, *Willingness to Pay* ], which he had attached to his memorandum in opposition to the City's motion in limine to exclude testimony on hedonic damages.

ages based upon willingness-to-pay studies.[23] Some courts have allowed such testimony.[24] However, we reject the minority view and agree with the majority trend towards inadmissibility of expert testimony on hedonic damages based on willingness-to-pay studies.

We stress that the narrow issue is whether an expert can assist a jury in valuing loss of *enjoyment* of life due to an injury; the value of life itself is, at most, tangentially related. "Assum[ing] that [the willingness-to-pay] methodology has some valid economic basis [to measure the value of life], we reject it from the legal standpoint because it has nothing to do with defining the particular value of the loss of *enjoyment of life[.]*" *Wilt*, 443 S.E.2d at 205 (emphasis in original). Under the *Wilt* analysis, the testimony proffered by Montalvo's expert would have been irrelevant.

Moreover, we agree with other courts that *assumptions* made in willingness-to-pay studies are questionable. "[T]he calculations are based on assumptions that appear to controvert logic and good sense." *Id.* As did the *Wilt* court, we find the following analysis of the United States Court of Appeals for the Seventh Circuit persuasive:

> We have serious doubts that [the] assertion that the studies [relied] upon actually measure how much Americans value life.... [S]pending on safety items reflects a consumer's willingness to pay to

reduce *risk*, perhaps more a measure of how cautious a person is than how much he or she values life.

> Few of us when confronted with the threat, "Your money or your life!" would, like Jack Benny, pause and respond, "I'm thinking, I'm thinking." Most of us would empty our wallets. Why that decision reflects less the value we place on life than whether we buy an airbag is not immediately obvious.

*Mercado*, 974 F.2d at 871 (emphasis in original).

The measurement of the joy of life is intangible. A jury may draw upon its own life experiences in attempting to put a monetary figure on the pleasure of living. It is "a uniquely human endeavor ... requiring the trier of fact to draw upon the virtually unlimited factors unique to us as human beings." *Foster*, 603 So.2d at 286. Testimony of an economist would not aid the jury in making such measurements because an economist is no more expert at valuing the pleasure of life than the average juror. "[T]he loss of enjoyment of life resulting from a permanent injury is ... not subject to an economic calculation." *Wilt*, 443 S.E.2d at 207.

Thus, because the proffered expert testimony on hedonic damages would have been irrelevant, would not have assisted the jury, and would not have added to the common understanding of the jury, we hold that the

**23.** *See Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196, 205 (1993) ("[t]he majority of jurisdictions that have addressed whether expert testimony based upon willingness-to-pay studies is relevant to one's loss of enjoyment of life have concluded that such testimony is inadmissible"), *cert. denied*, —— U.S. ——, 114 S.Ct. 2137, 128 L.Ed.2d 867 (1993); *Mercado v. Ahmed*, 974 F.2d 863, 871 (7th Cir.1992) ("we have serious doubts about [the expert's] assertion that [willingness-to-pay] studies ... actually measure how much Americans value life"); *Livingston v. United States*, 817 F.Supp. 601 (E.D.N.C.1993); *Southlake Limousine v. Brock*, 578 N.E.2d 677 (Ind. App.1991); *Fetzer v. Wood*, 211 Ill.App.3d 70, 155 Ill.Dec. 626, 569 N.E.2d 1237 (1991); *Sterner v. Wesley College*, 747 F.Supp. 263, 274 (D.Del.1990); *see also* McClurg, *It's a Wonderful Life, supra*, at 105–06 ("[t]he most basic flaw in the willingness-to-pay theory ... is that it simply does not comport with the reality of how people behave.... Given the flaws of the willingness-to-pay theory and the wide-ranging values it gen-

erates, the extent to which willingness-to-pay evidence meaningfully assists a jury in calculating damages for the intrinsic value of lie is suspect at best"); *cf. Foster v. Trafalger House Oil & Gas*, 603 So.2d 284, 286 (La.App.1992) ("economic theories which attempt to extrapolate the 'value' of human life from various studies of wages, costs, etc., have no place in the calculation of general damages").

**24.** *See Sherrod v. Berry*, 629 F.Supp. 159 (N.D.Ill. 1985), *aff'd*, 827 F.2d 195 (7th Cir.1987), *vacated*, 835 F.2d 1222 (7th Cir.1988), *rev'd on other grounds*, 856 F.2d 802 (7th Cir.1988); and *Johnson v. Inland Steel*, 140 F.R.D. 367, 372 (N.D.Ill. 1992).

Given *Mercado, supra*, which was decided after both *Sherrod* and *Inland Steel*, we question the persuasive value of the federal district court cases. The District Court of Illinois is in the Seventh Circuit and thus *Mercado* implicitly overruled or limited *Sherrod* and *Inland Steel*.

trial court did not abuse its discretion by excluding it.

## IV. CONCLUSION

Because the trial court erred in (1) not instructing the jury on legal causation when it was the primary issue in the case, (2) restricting the scope of the special verdict form, and (3) instructing the jury incorrectly on apportionment of damages, we vacate the judgment and remand this case for new trial. We agree, however, that the court correctly excluded expert testimony on hedonic damages.

NAKAYAMA, Justice, concurring and dissenting, with whom WEIL, Circuit Judge, joins.

I concur in the majority opinion except as to part III.A.2.b. Because I believe that under these circumstances the court should not recognize as plain and reversible error the trial court's failure to give a jury instruction explaining the meaning of legal causation, I respectfully dissent from part III. A.2.b.

The plain error doctrine represents a departure from the normal rules of waiver that govern appellate review, *i.e.*, that a party who invites error in the trial court waives the right to have the error considered on appeal. *See Chung v. Kaonohi Center Co.*, 62 Haw. 594, 603, 618 P.2d 283, 290 (1980); *Earl M. Jorgensen Co. v. Mark Constr., Inc.*, 56 Haw. 466, 475–76, 540 P.2d 978, 985 (1975). The doctrine rests on a simple equitable proposition: the consequences of the ordinary rule of waiver can be severe and where it would result in a miscarriage of justice, the rule will not be followed. *See State v. Fox*, 70 Haw. 46, 56 n. 2, 760 P.2d 670, 676 n. 2 (1988) ("In civil cases, the plain error rule is only invoked when 'justice so requires.'") (quoting *Bertelmann v. Taas Assoc.*, 69 Haw. 95, 103, 735 P.2d 930, 935 (1987)); *accord Chung*, 62 Haw. at 603, 618 P.2d at 290; *Turner v. Willis*, 59 Haw. 319, 324, 582 P.2d 710, 714 (1978).

Because the plain error doctrine is based on notions of equity and justice, it follows that the party on whose behalf the doctrine is invoked must satisfy the age-old maxim of jurisprudence that those "who seek equity must do equity." In other words, the court should not call upon its equitable powers in the name of justice to benefit a party who comes before the court with "unclean hands." In my view, the majority fails to heed that sensible rule.

The majority acknowledges that during the settlement of the jury instructions, the City requested the standard jury instruction defining legal causation in terms of the "substantial factor" test. Majority at 287 & n. 6, 884 P.2d at 350 & n. 6. That instruction properly stated the law. *Id.* at 288–89, 884 P.2d at 351–52. Montalvo did not submit his own instruction. Apparently sensing an opportunity to gain an advantage because there was no other instruction defining legal causation, the City then withdrew its obviously correct instruction and submitted a plainly incorrect one in its stead. *Id.* at 287 & 289, 884 P.2d at 350 & 352. There can be no doubt that the City did so because it believed, correctly or incorrectly, that the second instruction was significantly more favorable to it.

The City's gambit failed when the trial court rejected the substituted instruction. The failure of the trial court to give the correct "substantial factor" instruction was a direct result of the City's tactical maneuvering. Now, having lost at trial, the City comes before this court and asks us, in the interests of justice, to reverse the jury's verdict based on the trial court's "plain error" in failing to give a legal causation instruction. In my view, because its misguided gamesplaying induced the error in the first place, the City forfeited any equitable claim it might otherwise have had to request that the court invoke the plain error doctrine.

Remarkably, the majority dismisses the City's role in causing the error as "unfortunate and misdirected" but "not outcome dispositive[,]" asserting that

> [t]he goal of preserving the integrity of the jury system far outweighs any argument that a party, who withdraws a crucial instruction, invited error and that, thus, any adverse verdict against such party should be affirmed as an appropriate sanction. The public's confidence in the jury system

obviously will not be enhanced by such a result.

Majority at 291, 884 P.2d at 354. I have my doubts about whether the public's confidence in the jury system is undermined by requiring parties to live with the results of errors that they invited, even if the errors go to "crucial" matters. In fact, the idea that parties must bear the cost of their own mistakes at trial is a central presupposition of our adversarial system of justice. *Fox,* 70 Haw. at 55, 760 P.2d at 675.

Assuming, however, that there is some reason for concern about the public's confidence in the jury system, I am willing to accept, as a general matter, that an appellate court may notice plain error when the trial court fails to give an instruction on an issue that is central to the matter being tried. But it should do so only when "justice so requires." *Bertelmann,* 69 Haw. at 103, 735 P.2d at 935. I strongly disagree that justice requires us to notice plain and reversible error in a case where the error was caused by a party's self-interested tactical maneuvering. Indeed, to my mind, justice requires that we *not* recognize plain error in such a situation.[1] To the extent that public confidence in the integrity of the jury system is the issue, I submit that rewarding a party for its gamesmanship by reversing a jury's unfavorable verdict has a far more deleterious and lasting impact on the public's confidence in the system than does forcing a party to live with the results of the trial errors that its machinations caused.

In mechanically applying a "three-pronged test" for noticing plain error, the majority has lost sight of the *sine qua non* to the plain error doctrine—that it is to be invoked only when "justice so requires." Given the circumstances under which the City induced the trial court's instructional error, justice does not require us to recognize plain error. I therefore dissent from part III.A.2.b. of the majority's opinion.

---

1. It is worth noting that none of the cases the majority relies on to support its conclusion that the failure to give a legal causation instruction amounts to plain error requiring reversal involved the sort of instructional games-playing present in this case.