114 F.3d 898
 Fed. Sec. L. Rep. P 99,475, 97 Cal. Daily Op. Serv. 4236,
97 Daily Journal D.A.R. 7124
 Leslie ABROMSON; Ronald Angelo; Louis Camardella; Eli
Ballan; Elie De Cominges; Sandra Kolker, and the plaintiff
class certified by the Court ("Class") consisting of all
persons and entities who purchased the common stock of
American Pacific Corporation ("AmPac") during the period
from April 15, 1992 through and including June 11, 1993 and
a sub-class certified by the Court ("Sub-Class") consisting
of all persons and entities who purchased the common stock
of AmPac issued in connection with an April 15, 1992 public
offering, Plaintiffs-Appellants,
v.
AMERICAN PACIFIC CORPORATION; Fred Gibson, Jr.; C. Keith
Rooker; David Keys; John R. Gibson; W. Carroll;
Thomas War; Thomas Turner; Norval
Pohl; Victor Rosenzweig,
Defendants-Appellees.
Leslie ABROMSON; Ronald Angelo; Louis Camardella; Eli
Ballan; Elie De Cominges; Sandra Kolker, and the plaintiff
class certified by the Court ("Class") consisting of all
persons and entities who purchased the common stock of
American Pacific Corporation ("AmPac") during the period
from April 15, 1992 through and including June 11, 1993 and
a sub-class certified by the Court ("Sub-Class") consisting
of all persons and entities who purchased the common stock
of AmPac issued in connection with an April 15, 1992 public
offering, Plaintiffs-Appellees,
v.
AMERICAN PACIFIC CORPORATION; Fred Gibson, Jr.; C. Keith
Rooker; David Keys; John R. Gibson; W. Carroll;
Thomas War; Thomas Turner; Norval
Pohl; Victor Rosenzweig,
Defendants-Appellants.
 
 Nos. 96-15250, 96-15316.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 11, 1997.
Decided June 5, 1997.
 Sheldon L. Albert and Anthony J. Bolognese, Barrack, Rodos & Bacine, Philadelphia, Pennsylvania, for plaintiffs-appellants.
 Warren L. Ettinger, Michael Rips, Barak Platt, Skadden, Arps, Slate, Meagher & Flom, Los Angeles, California, and Steve Morris, Morris, Brignone & Pickering, Las Vegas, Nevada, for defendants-appellees.
 Randall W. Quinn, Securities and Exchange Commission, Washington, D.C., as amicus curiae.
 Appeals from the United States District Court for the District of Nevada; Philip M. Pro, District Judge, Presiding. D.C. No. CV-93-00576-PMP.
 Before: BRUNETTI, FERNANDEZ and HAWKINS, Circuit Judges.
 OPINION
 FERNANDEZ, Circuit Judge:
 
 
 1
 Leslie Abromson, Ronald Angelo, Louis Camardella, Eli Ballan, Elie de Comminges, and Sandra Kolker (collectively "Abromson"), acting on their own behalf and on behalf of a court-certified class and sub-class, appeal the district court's judgment in favor of defendants American Pacific Corporation, Fred Gibson, Jr., C. Keith Rooker, David Keys, John R. Gibson, W. Carroll, Thomas War, Thomas Turner, Norval Pohl, and Victor Rosenzweig (collectively "AmPac") in Abromson's action against AmPac for securities fraud under 15 U.S.C. §§ 77k, 77o (Securities Act of 1933, as amended, §§ 11, 15) and 15 U.S.C. §§ 78j(b), 78t (Securities Exchange Act of 1934, as amended, §§ 10(b), 20) and 17 C.F.R. § 240.10b-5 (Rule 10b-5). Abromson alleged misrepresentations or omissions regarding AmPac's relationship with Thiokol Corporation, its largest customer, and regarding the business prospects of the fire suppression agent Halotron. The district court certified a class of plaintiffs comprising any person who purchased AmPac stock between April 15, 1992 and June 11, 1993, the "class period," and a sub-class of persons who purchased stock in AmPac's public offering of April 15, 1992. The district court granted AmPac's motion for summary judgment on the Thiokol claims and it granted summary judgment in favor of the outside directors of AmPac on all claims. After trial, a jury returned a verdict in favor of AmPac on the Halotron claims. The district court thereafter entered judgment for AmPac. Abromson appealed and AmPac cross appealed the district court's denial of its motion for judgment as a matter of law on claims that went to the jury. We affirm.
 
 BACKGROUND
 
 2
 On April 15, 1992, AmPac and certain selling shareholders issued shares in a public offering of its common stock. On that date, AmPac's stock closed trading at a price of $31 1/2 per share. On June 11, 1993, AmPac's stock closed trading at a price of $20 1/2 per share. Abromson brought suit against AmPac under §§ 77k, 77o, 78j(b), 78t, and Rule 10b-5, on the basis of alleged misstatements regarding AmPac's relationship with Thiokol, the customer that provided the lion's share of AmPac's revenues (40%, 47%, and 63%, respectively, in the three years preceding 1991). Abromson alleged misrepresentations or omissions regarding AmPac's agreement to supply Thiokol with ammonium perchlorate (AP), the oxidizing agent for solid-fuel rockets.
 
 
 3
 When an explosion destroyed one of the two AP manufacturing facilities in the United States, NASA became concerned because it wanted two sources for that substance. That led to a contract between AmPac's subsidiary, Western Electrochemical Corporation and Thiokol.[1] AmPac agreed to build a new AP manufacturing facility and Thiokol advanced the funds with which to begin construction. AmPac also entered into a loan agreement with Security Pacific Bank Washington, N.A.,[2] pursuant to which it obtained financing of $92 million for the facility. Thiokol agreed that during the seven year amortization period of the Security Pacific loan, it would place enough orders for AP to assure repayment of the loan. Moreover, Thiokol agreed to pay a surcharge on all AP orders during the amortization period of the loan in order to help defray the costs of constructing and financing the AP manufacturing facility. The agreements between Thiokol and AmPac were incorporated by reference into Thiokol's contract with NASA.
 
 
 4
 Prior to and during the class period, AmPac made numerous declarations in which it stated that Thiokol was "obligated" to purchase AP during the seven-year period following the commencement of the agreements, that these sales were "assured," and that the Thiokol contract would "insulate" AmPac from competition in the AP market. AmPac included those statements in its SEC filings, including AmPac's annual 10-K reports for 1991 and 1992, as well as the prospectus for the April 15, 1992 stock offering.
 
 
 5
 At the same time, NASA wanted to shorten the seven-year amortization period for AmPac's loan from Security Pacific, and AmPac was engaged in discussions about that with officials from NASA and Thiokol. In fact, AmPac's 1991 10-K report indicates the possibility of paying off the Security Pacific loan in 1994, three years earlier than anticipated by the original agreement. However, the parties disagreed on the question of whether early repayment of the loan would terminate Thiokol's obligation to purchase AP from AmPac. The parties did not reach an agreement on repayment, and they continued to disagree regarding the effect of any repayment upon Thiokol's purchase obligations.
 
 
 6
 The public became aware of the disagreement on June 11, 1993, when Thiokol filed suit in Utah state court against AmPac and sought a judicial declaration that complete repayment of the Security Pacific loan would terminate Thiokol's contractual obligation to purchase AP from AmPac. Thiokol alleged that AmPac had agreed to early repayment of the loan. That agreement simply did not exist, and there was no evidence that it did. Upon public disclosure of Thiokol's lawsuit, the price of AmPac's stock dropped precipitously. Abromson asserts that AmPac should have publicly disclosed the disagreement among it, NASA, and Thiokol regarding the contractual agreements and that the failure to do so violated the securities laws.
 
 
 7
 Abromson also faults AmPac's disclosures with respect to Halotron, a fire suppression agent intended to replace Halon, a more widely used substance that may cause damage to the ozone layer. The district court denied AmPac's request for summary judgment and the case went to trial on the Halotron claims. During his opening statement regarding them, AmPac's attorney made reference to the absence of a Securities and Exchange Commission enforcement proceeding against the defendants. Abromson now argues that the remark was improper and that it requires reversal of the judgment. In addition, Abromson argues that the court's failure to give one of her proposed instructions was an error requiring reversal. AmPac moved for judgment as a matter of law on the Halotron claims both at the close of Abromson's case and at the close of all evidence. It now cross appeals the district court's denial of those motions.
 
 JURISDICTION AND STANDARD OF REVIEW
 
 8
 The district court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291.
 
 
 9
 We review de novo a district court's grant of summary judgment. See Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996); Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994). We must determine whether "the evidence, viewed in a light most favorable to the nonmoving party, presents any genuine issues of material fact and whether the district court correctly applied the law." Warren, 58 F.3d at 441; see Jesinger, 24 F.3d at 1130. Our review "is governed by the same standard used by the trial court under Federal Rule of Civil Procedure 56(c)." Jesinger, 24 F.3d at 1130. In the trial court, the party moving for summary judgment has the initial burden of " 'showing'-that is pointing out to the District Court-that there is an absence of evidence to support the nonmoving party's case," when the nonmoving party bears the burden of persuasion on the issue in question. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "Summary judgment may be defeated in a securities fraud derivative suit 'only by showing a genuine issue of fact with regard to a particular statement by [the company] or its insiders.' " Hanon v. Dataproducts Corp., 976 F.2d 497, 500 (9th Cir.1992) (quoting Schneider v. Vennard (In re Apple Computer Sec. Litig.), 886 F.2d 1109, 1118 (9th Cir.1989)).
 
 
 10
 We review a district court's formulation of civil jury instructions for an abuse of discretion. See Fikes v. Cleghorn, 47 F.3d 1011, 1013 (9th Cir.1995). The district court must formulate jury instructions so that they fairly and adequately cover the issues presented, correctly state the law, and are not misleading. See id. We consider the instructions as a whole and apply an abuse of discretion standard to determine if they are misleading or inadequate. See Masson v. New Yorker Magazine, Inc., 85 F.3d 1394, 1397 (9th Cir.1996). We will not reverse an error in instructing the jury in a civil case if it is more probably than not harmless. See Phillips v. United States Internal Revenue Serv., 73 F.3d 939, 941 (9th Cir.1996).
 
 DISCUSSION
 I. Summary Judgment on Thiokol Claim
 
 11
 Abromson asserts that when public disclosures were made AmPac improperly omitted information that there was a dispute with Thiokol over the issue of the effect of the prepayment of the Security Pacific loan by AmPac. She claims that the omission was material. We do not agree.
 
 
 12
 "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important...." TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); see Basic, Inc. v. Levinson, 485 U.S. 224, 231, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). To survive a motion for summary judgment, a plaintiff must demonstrate that a failure to disclose particular information conveyed a false or misleading impression. See Hanon, 976 F.2d at 501. We have considered a failure to disclose material only when the company had certain, concrete information contradicting its optimistic or positive statements. See, e.g., Kaplan v. Rose, 49 F.3d 1363, 1371-74 (9th Cir.1994); Hanon, 976 F.2d at 503; In re Apple Computer, 886 F.2d at 1115-16. We have also held that a plaintiff cannot demonstrate a material omission on the basis of "speculative, nebulous" evidence. See Miller v. Pezzani (In re Worlds of Wonder Sec. Litig.), 35 F.3d 1407, 1418 (9th Cir.1994); see also ZVI Trading Corp. Employees' Money Purchase Pension Plan & Trust v. Ross (In re Time Warner Sec. Litig.), 9 F.3d 259, 267 (2d Cir.1993) (a company does not have to disclose poor progress in business negotiations, even when it previously made optimistic statements about the prospects of those dealings). When assessing materiality, we consider both the magnitude of the potential loss and the likelihood that it will actually take place. See Basic, 485 U.S. at 238, 108 S.Ct. at 987. For example, a company would not have to disclose a potentially serious loss, if it faced only an infinitesimal possibility that the loss would occur.
 
 
 13
 Abromson focuses on AmPac's failure to disclose its disagreement with Thiokol regarding the effect of an early repayment of the Security Pacific loan. However, that disagreement could have had adverse consequences for AmPac only if it had agreed to early repayment of the Security Pacific loan or if Thiokol or NASA could have compelled early repayment. But, there was no probative evidence that AmPac either had agreed to or could be forced to pay off that loan. In fact, in the action it filed in Utah, even Thiokol did not allege that it could compel early repayment. Rather, it baldly asserted in its declaratory judgment complaint that AmPac had already agreed to an early repayment. However, no such agreement existed, and there was no evidence that it did. Thus, even if Thiokol's dubious claim regarding the effect of a repayment on its purchase obligations were correct, AmPac could only suffer if it agreed to an early pay off of the loan and thereby foolishly risked serious financial losses. Absent that almost inconceivable act by AmPac, Thiokol's assertion was simply irrelevant to AmPac's representations to the securities market and no reasonable investor could have believed otherwise. In other words, any possible negative effect resulting from the information which Abromson alleges that AmPac failed to disclose regarding its contractual relationship, rights, and duties was at most speculative and uncertain. Indeed, assuming that an early termination of Thiokol's purchase obligation might possibly have had a serious effect on AmPac, the probability that a termination would take place without action by AmPac to fully protect its position was virtually zero. Therefore, any potential loss was immaterial under the securities laws.[3]
 
 II. Halotron Claim
 
 14
 In his opening statement to the jury, counsel for AmPac stated that the SEC had not proceeded against AmPac. There was an immediate objection, which was sustained. Abromson now asserts that the very mention of that matter was sufficient to constitute reversible error.
 
 
 15
 We have not previously decided whether a reference during the trial of a private securities action to the absence of a SEC enforcement proceeding constitutes error at all. We do not reach that question today because it is clear that the reference was harmless. "[W]hen an appellate court ponders the probable effect of an error on a civil trial, it need only find that the jury's verdict is more probably than not untainted by the error." Haddad v. Lockheed Calif. Corp., 720 F.2d 1454, 1459 (9th Cir.1983). Moreover, we have refused to find reversible error where concededly improper remarks were made, but not repeated, during opening statements or closing arguments. See, e.g., Kehr v. Smith Barney, Harris Upham & Co., Inc., 736 F.2d 1283, 1286 (9th Cir.1984); United States v. Vargas-Rios, 607 F.2d 831, 838 (9th Cir.1979); Moore v. Telfon Communications Corp., 589 F.2d 959, 966 (9th Cir.1978); United States v. Hood, 493 F.2d 677, 681-82 (9th Cir.1974). The trial of the Halotron claim lasted eighteen days. The allegedly improper reference to the SEC that Abromson complains of occurred in AmPac's opening statement, and the district court instructed the jury that it should only rely on the evidence in the case. It also stated that there would be no evidence on the subject of the absence of an SEC proceeding. The reference was not repeated, and it is highly improbable that it had any effect on the verdict. Thus it was harmless.
 
 
 16
 Abromson complains of the district court's failure to give her requested jury instruction on the specific legal standard regarding misleading projections and statements of belief and optimism. However, she has waived any objection. When the district court indicated that the proposed instruction was argumentative and proposed a different one that covered the matter, she did not object, even though it cannot be said that an objection would have been futile. Instead, Abromson acquiesced in the court's substitute instruction. The court said, "Take a look at this one," and her attorney said, "That's acceptable from our perspective, your honor." By agreeing with the court, rather than preserving an objection to the court's denial of the proposed jury instruction, Abromson waived her right to appeal that issue. See Fed.R.Civ.P. 51 ("No party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection."); see also Hammer v. Gross, 932 F.2d 842, 847 (9th Cir.1991) (en banc) (Canby, J., plurality opinion); Lifshitz v. Walter Drake & Sons, Inc., 806 F.2d 1426, 1430 (9th Cir.1986). In light of her acquiescence in the court's ruling, it can hardly be said that Abromson "stated distinctly" the matter objected to and the ground of the objection.[4]
 
 III. Cross-Appeal
 
 17
 Our decision to affirm the district court's final judgment renders AmPac's cross-appeal moot. We therefore dismiss it. See Kapp v. National Football League, 586 F.2d 644, 649-50 (9th Cir.1978).
 
 
 18
 The judgment of the district court is AFFIRMED. AmPac's cross-appeal is DISMISSED.
 
 
 19
 HAWKINS, Circuit Judge, Concurring in Part and Dissenting in Part:
 
 
 20
 I concur in Parts II (Halotron) and III (Cross-Appeal) of the majority, but regret that I cannot embrace the affirmance of the grant of summary judgment to AmPac on the Thiokol claim.
 
 
 21
 While officials of AmPac were telling the investing public that the company was "insulated from competition" because of Thiokol's obligation to purchase its product, AmPac insiders sold off approximately $11 million worth of stock. When the investing public learned what the insiders already knew--that Thiokol believed it would be free of the obligation upon AmPac's prepayment of the Security Pacific obligation--AmPac's stock plummeted in value. There may be a perfectly reasonable explanation for these events, but no jury ever heard it. The materiality of such actions, so closely related to the integrity of AmPac's omissions, is simply inappropriate for resolution by summary judgment.
 
 
 22
 To succeed on the Thiokol claim, the plaintiff needed to demonstrate a "material" omission or misrepresentation. Gray v. First Winthrop Corp., 82 F.3d 877, 884 (9th Cir.1996) (elements of Rule 10b-5 claim); Kaplan v. Rose, 49 F.3d 1363, 1371 (9th Cir.1994) (elements of § 77k claim). "It is a violation of the securities law to omit to state a material fact if it is 'necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.' " Vaughn v. Teledyne, Inc., 628 F.2d 1214, 1221 (9th Cir.1980) (quoting 17 C.F.R. § 240.10b-5(b) (1979); 15 U.S.C. § 78n(c)).
 
 
 23
 The district court granted summary judgment to AmPac with respect to the Thiokol claim on the ground that AmPac's failure to disclose the Thiokol dispute did not constitute an omission of material fact. It is difficult to imagine a more fact intensive issue than materiality. Indeed, our prior cases teach us that it is an issue which should ordinarily be left to the trier of fact. See, e.g., Basic, Inc. v. Levinson, 485 U.S. 224, 239-40, 108 S.Ct. 978, 987-88, 99 L.Ed.2d 194 (1988); Kaplan, 49 F.3d at 1381; Schneider v. Vennard (In re Apple Computer Sec. Litig.), 886 F.2d 1109, 1113 (9th Cir.1989).
 
 
 24
 Summary judgment on the grounds that the alleged misstatements were not material is appropriate "only if the adequacy of the disclosure or the materiality of the statement is 'so obvious that reasonable minds [could] not differ.' " Fecht v. The Price Company, 70 F.3d 1078, 1081 (9th Cir.1995) (quoting Durning v. First Boston Corp., 815 F.2d 1265, 1268 (9th Cir.1987)).
 
 
 25
 Abromson opposed summary judgment by arguing that AmPac's positive statements about the Thiokol contracts were rendered materially misleading by two developments: (1) the government's desire to force early repayment of the loan; and (2) the parties' disagreement regarding the effect of an early repayment on Thiokol's contractual obligations to AmPac. The majority dismisses Abromson's contention, emphasizing that AmPac would not "foolishly" risk financial loss by prepaying the loan to Security Pacific. This ignores that there was a real live dispute as to whether NASA and/or Thiokol (in view of all the documents, not just the loan agreement between AmPac and Security Pacific) had the right to compel prepayment by AmPac. Furthermore, at the time that the government, Thiokol, and AmPac were in the midst of contract discussions over the impact of repayment, Thiokol's announcement that it took the position that prepayment alleviated its purchase obligations, was quickly followed by several senior AmPac executives selling off large blocks of their own stock. One particularly bold executive (who had not previously owned AmPac stock) exercised his stock options and then immediately sold the stock. Cf. S.E.C. v. Texas Gulf Sulphur Co., 401 F.2d 833, 851 (2d Cir.1968) (en banc) (timing of insider trades, including trading by individuals who had not previously owned stock, constitutes "highly pertinent" "truly objective" evidence of materiality); see also Basic, 485 U.S. at 240 n. 18, 108 S.Ct. at 988 n. 18 (citing Texas Gulf Sulphur and acknowledging that insider trading can indicate materiality).
 
 
 26
 The majority's conclusion that the Thiokol dispute was so obviously immaterial that it should not reach a jury is belied by the dramatic fall in the per share price of AmPac's stock on the very day AmPac issued a press release revealing the Thiokol lawsuit. This precipitous drop occurred despite AmPac's attempts to reassure the public in its press release that there was no agreement to prepay the loan and the parties could not force AmPac to do so. Yet, the majority insists that no reasonable investor would find Thiokol's position relevant without an agreement by AmPac to prepay the loan.
 
 
 27
 The standard for materiality (as the majority itself states it) is whether a jury could find a substantial likelihood that a reasonable shareholder would consider it important to know all these matters. TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Because of the fact-specific nature of this inquiry, the standard for summary judgment on the issue of materiality is quite high: summary judgment is inappropriate unless the undisclosed matter is so obviously immaterial that reasonable minds could not differ. Fecht, 70 F.3d at 1081. In other words, the matter need not obviously be material--it is enough to survive summary judgment if reasonable minds might disagree as to materiality.
 
 
 28
 I believe the district court erred in finding the Thiokol dispute immaterial, especially when AmPac insiders, armed with knowledge the investing public lacked, avoided the very losses that befell ordinary stockholders when Thiokol's position became publicly known. Public confidence in our securities markets is essential to investor and promoter alike. Perhaps there is a perfectly sensible explanation for the stock activities here, an explanation having nothing to do with what the AmPac insiders knew and the investing public did not. The summary judgment grant on the Thiokol claim, however, not only deprived plaintiffs of their opportunity to have a jury decide the issue, it also meant that AmPac officials could not tell their side of the story and have it tested by time-honored adversarial tools such as cross-examination. Both sides are left with more questions, and questions about their actions, than answers. Summary judgment was never meant to so short-circuit the search for truth and the average person's day in court. I respectfully dissent from the decision to affirm summary judgment on this issue.
 
 
 
 [1]
 Because the distinction between AmPac and Western Electrochemical, an AmPac subsidiary, is immaterial for purposes of this lawsuit, the name AmPac will be used to refer to both entities
 
 
 [2]
 Security Pacific was subsequently replaced by Seattle First National Bank; because the identity of the lender is irrelevant in this case, the loan will be referred to in this opinion as the "Security Pacific loan."
 
 
 [3]
 We are aware of the fact that some stock was sold by insiders at the relevant times. But that does not automatically require disclosure of otherwise immaterial events. Rather, the presence of insider sales is at most probative of materiality. See Basic, 485 U.S. at 240 n. 18, 108 S.Ct. at 988 n. 18. Abromson has not presented evidence that the timing of the insider trades "virtually compels" a finding that those trades resulted from the Thiokol dispute. Cf. SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 851 (2d Cir.1968). In fact, if insiders knew anything, they knew that AmPac had not agreed to repay the loan, could not be forced to do so, and had not been informed of assertions to the contrary
 
 
 [4]
 Because we hold that the district court properly gave judgment against Abromson on her claims against the company, we need not discuss her appeal of its judgment in favor of the outside directors. Clearly, there was no wrong to hold them responsible for