**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KRISTI W. DORN, personal
representative est Larry M. Dorn,
       *Plaintiff-Appellee,*

    v.

BURLINGTON NORTHERN SANTA FE
RAILROAD COMPANY,
       *Defendant-Appellant.*

No. 03-35071

D.C. No.
CV-99-00168-RFC

OPINION

Appeal from the United States District Court
for the District of Montana
Richard F. Cebull, District Judge, Presiding

Argued and Submitted
August 5, 2004—Seattle, Washington

Filed February 7, 2005

Before: Andrew J. Kleinfeld, Consuelo M. Callahan,
Circuit Judges, and William O. Bertelsman,* District Judge.

Opinion by Judge Callahan

---

*The Honorable William O. Bertelsman, Senior United States District
Judge for the Eastern District of Kentucky, sitting by designation.

**COUNSEL**

Charles G. Cole and Alice E. Loughran, Steptoe & Johnson LLP, Washington, D.C., for the defendant-appellant.

Alexander (Zander) Blewett, III and Kurt M. Jackson, Hoyt & Blewett PLLC, Great Falls, Montana for the plaintiff-appellee.

Susan J. Rebeck, Nick A.W. Rotering, Montana Department of Transportation Legal Services, Helena, Montana, for the amicus curiae.

## OPINION

CALLAHAN, Circuit Judge:

This is an appeal from a jury verdict awarding the plaintiff in a wrongful-death and survivorship action $6,655,200 in compensatory and punitive damages. The defendant seeks a new trial, arguing that the district court reached an incorrect legal conclusion that infected certain evidentiary rulings, the jury instructions, and the manner in which the punitive-damages phase of the trial was conducted. We agree that the district court should have granted the defendant's motion for a new trial in light of various trial errors. Having jurisdiction under 28 U.S.C. § 1291, we reverse the judgment and remand.

### I.   Background

Near Hardin, Montana, railroad tracks of the Burlington Northern Santa Fe Railway Company ("Burlington") run north and south parallel to Montana Highway 87. Somewhere thereabouts, a short gravel road leads from Highway 87 in a southwestwardly direction. Approximately ninety-four feet from Highway 87, the gravel road crosses the Burlington's railroad tracks at a sharp angle (roughly 45 degrees) as it heads into the parking lot of Cenex, a privately-owned commercial grain elevator. The gravel road also provides access to a number of residences that lie beyond Cenex's facility.

Burlington did not build the gravel road, the pertinent portions of which lie on land owned by the State of Montana or by Burlington. Rather, Cenex's predecessor constructed the gravel road pursuant to a permit from the Montana Depart-

ment of Transportation ("MDT") in 1968. Burlington nonetheless installed a stop sign with a railroad-crossing symbol at the edge of the tracks — albeit without crossing gates or warning lights.

In 1975, a truck traveling west on the gravel road across Burlington's tracks was struck by a southbound train. This scenario unfolded again at the same location 21 years later in 1996. After the 1996 accident, Burlington was provided with the opinion of a consultant. The consultant opined that the cause of the accident was the truck driver's inability to see far enough up the tracks at such a sharp angle to detect the oncoming train in time to avoid a collision. The consultant also recommended realigning the angle of the crossing from 45 degrees to 90 degrees and installing automatic crossing gates with flashing lights. Neither Montana, nor Cenex, nor Burlington realigned the crossing, or installed automatic gates or flashing lights.

On the afternoon of December 2, 1999, Larry Dorn was driving a grain truck along the gravel road from Highway 87 toward the Cenex facility as a southbound Burlington train approached the crossing. Evidence in the record suggests that other truckers had warned him that morning that he should not follow the gravel road's 45-degree angle as he approached the tracks; instead, he should "square up" his truck to the tracks at a 90-degree angle before crossing so as to get a longer and better view of the tracks to the north. Additionally, there is conflicting evidence as to whether Dorn approached the tracks at a 45-degree angle, or if he altered his vehicle's trajectory to "square up" perpendicular to the tracks. Finally, there is also some question as to whether he came to a complete stop at the tracks before starting across them.

In any event, Dorn did not make it all the way to the other side of the crossing. He was struck and killed by the oncoming train. Aged twenty-three years, he was a husband and the father of a two-year-old daughter at the time of his death.

Seeking compensatory and punitive damages and asserting diversity jurisdiction, Dorn's widow, Kristi W. Dorn ("plaintiff"), filed a wrongful-death and survivorship action against Burlington in the United States District Court for the District of Montana.

## II.  Procedural History

Prior to trial, plaintiff filed a motion in limine to prevent Burlington from arguing that her husband could have "squared up" to the crossing. District Judge Jack D. Shanstrom (who presided over the case in its pretrial stages) prohibited Burlington "from mentioning or arguing to the jury that . . . Dorn should have driven in the left hand on-coming lane of traffic . . . in order to reposition his truck or square-up to approach the crossing at a 90 degree angle." Subsequent rulings suggest that the district court premised this prohibition on the notion that the gravel road was a public highway subject to Montana's traffic laws — one of which generally forbids motorists from maneuvering their vehicles away from the right half of the roadway. Mont. Code Ann. § 61-8-321. This public-highway determination also led the court to rule that Dorn was not obliged to obey the stop sign erected by Burlington, on the theory that a private company was not authorized to erect a traffic control signal on a public highway.

The case was later reassigned to District Judge Richard F. Cebull, who, consistent with his predecessor's orders, denied Burlington's motion to strike plaintiff's claim for punitive damages. In particular, District Judge Cebull specified that Burlington could not submit evidence that it had put up a stop sign or that Dorn should have obeyed it. The district court indicated that it would allow Burlington to put on evidence that it had erected a non-complying stop sign only if plaintiff implied to the jury that the visual warnings at the crossing were inadequate.

## A.   Expert Witnesses

During the trial, plaintiff called two expert witnesses to testify about the cause of the accident, and one expert to offer his opinions about hedonic damages.[1] Meanwhile, Burlington sought to advance the theory at trial that Dorn had "squared up" to the tracks but did not stop before crossing them.

### 1.   Montana Highway Patrol Officer Steve Wiesnewski

One of plaintiff's experts, Montana Highway Patrol Officer Steve Wiesnewski, explained that he had investigated Dorn's accident on the day that it occurred. Wiesnewski stated that he found a tire mark at the crossing that was at a 45-degree angle to the tracks. However, a videotape of the accident scene as it appeared that evening, recorded by the Montana Highway Patrol, depicts the tire mark lying at 90 degrees in relation to the tracks. The videotape initially was admitted into evidence as an exhibit without objection, and Wiesnewski testified that it was necessary to review the video to understand what happened in the accident.

The district court, however, excluded the videotape when the plaintiff objected that the parties had not questioned Wiesnewski about the videotape during his deposition. The district court also ordered Burlington not to ask Wiesnewski, on cross-examination, whether the videotape shows the tire mark lying at a 90-degree angle, as such a question would "call for expert testimony that was not disclosed." The district court also forbade Burlington from questioning Wiesnewski on his perception of the tire mark's direction. Nonetheless, Wiesnewski conceded during cross-examination that he believed that the vehicle was perpendicular to the tracks at the time of the accident. The district court then granted plaintiff's verbal motion to strike and instructed the jury to disregard Wies-

---

[1]Hedonic damages are those "that attempt to compensate for the loss of the pleasure of being alive." Black's Law Dictionary 395 (7th ed. 1999).

newski's concession, on the ground that it was "directly contrary to his testimony on direct."

## 2.   William Douglas Berg, Ph.D.

Later in the trial, plaintiff called another expert, William Douglas Berg, who holds a Ph.D. in civil engineering. Berg told the jury that it was physically impossible to drive along the gravel road and approach the crossing at a 90-degree angle without going off the road — regardless of whether a truck crossed the centerline. Burlington sought to rebut this opinion by calling certain truck drivers to testify that they had managed on a daily basis to "square up" to the tracks at a right angle, without going off the road. Burlington also asked for permission to submit evidence that other truck drivers had cautioned Dorn to "square up" to the crossing on the day of his death.

The district court recollected the pretrial ruling on plaintiff's motion in limine, where District Judge Shanstrom prohibited any suggestion that Dorn *should* have crossed the centerline to get a better view. The district court construed this ruling as barring evidence that Dorn *could* have approached the crossing at a 90-degree angle, and denied both of Burlington's requests.

## 3.   Stan V. Smith, Ph.D.

Finally, plaintiff called Stan V. Smith, Ph.D., an economist, to provide expert opinions regarding hedonic damages in general, as opposed to Dorn's hedonic damages in particular. Burlington objected to this evidence, insisting that the theory of hedonic damages was unreliable and that testimony on the topic would invade the province of the jury. The district court overruled the objection and allowed the jury to consider Smith's opinions.

In response, Burlington sought to call Thomas Ireland, Ph.D., to opine that economists lack the tools to estimate the

value of a human life. In so doing, Ireland would *not* have testified that Smith had somehow overestimated or miscalculated the generalized measure of hedonic damages. Before Ireland was examined in front of the jury, however, plaintiff protested that "the [c]ourt . . . has already determined that there is sufficient reliability to allow [Smith's calculations] to go to the jury, so [Ireland] should not be able to impeach the [c]ourt by what he's saying, that this is junk science and those types of things." The district court expressed an inclination to agree with plaintiff, but allowed Burlington to make an offer of proof by examining Ireland out of the jury's presence.

Without using the words "junk science" or "irrelevant" in his voir dire, Ireland basically indicated that economists cannot measure the value of a human life because there is no market for happiness, for lost society, or for lost enjoyment of life. Ireland went on to explain that his proposed testimony would not attack the district court's admissibility ruling, but would only challenge Smith's methodology and credibility. Nevertheless, without finding him unqualified to serve as an expert witness, the district court barred the jury from hearing Ireland's opinions, concluding that they were an attack on the legal determination that Smith's testimony was admissible.

## B.    Compensatory and Punitive Damages

After the first phase of the bifurcated trial, the jury returned a special verdict, finding that Burlington's negligence had caused Dorn's death, and rating Dorn's contributory negligence at thirty-five percent. The jury awarded plaintiff $1,000,000 in wrongful-death damages and $1,008,000 in survivorship damages.[2] The jurors also found that Burlington

---

[2] The special verdict form did not provide the jury with an opportunity to break down these awards into any other categories; for example, economic damages or hedonic damages. Accounting for Dorn's contributory negligence, the district court later reduced the survivorship damages to $655,200 — bringing the total compensatory damages to $1,655,200.

either had knowledge of facts, or intentionally disregarded facts, that created a strong probability of harm to Dorn, and that Burlington deliberately acted with indifference to that circumstance.

Consequently, the trial moved into the second phase, where the jury determined the extent of punitive damages. During this phase, the district court permitted the jury to consider only evidence of Burlington's net worth. The district court barred any evidence suggesting that Burlington regarded the gravel road as a private driveway where traffic laws did not apply to prohibit drivers from "squaring up" to the crossing. The jury returned an award of $5,000,000 in punitive damages. Thereafter, the district court entered judgment and denied Burlington's motion for a new trial. Burlington timely appealed.

## III.   Discussion

On appeal, Burlington argues that the district court abused its discretion in refusing to order a new trial in light of numerous flaws in the proceedings. Specifically, Burlington claims that the district erred in: (1) determining that the gravel road was a public highway as a matter of Montana law, and barring evidence that Burlington regarded the gravel road as a private driveway, regardless of whether it was, legally speaking, a public highway; (2) ordering Burlington to refrain from cross-examining Officer Wiesnewski about the videotaped depiction of the tire track, and striking the officer's concession regarding the angle of Dorn's truck as it approached the tracks; (3) preventing Burlington from impeaching Berg's testimony with witnesses who had "squared up" to the tracks without going off the road, and with testimony that Dorn had been warned to "square up" to the crossing; (4) permitting Smith to offer expert opinion on hedonic damages, and excluding Ireland's testimony on the inability of economists to measure hedonic damages; (5) declining to instruct the jury on corporate responsibility for punitive damages; and (6) fail-

ing to conduct a proper review of the punitive damages award.

## A.  Standard of Review

We review for abuse of discretion a district court's denial of a motion for a new trial under Federal Rule of Civil Procedure 59(a). *Jorgensen v. Cassiday*, 320 F.3d 906, 918 (9th Cir. 2003). A district court abuses its discretion in denying a motion for a new trial when its erroneous inclusion or exclusion of evidence in the underlying proceeding prejudices a party's right to a fair trial. *See Dabney v. Montgomery Ward & Co., Inc.*, 692 F.2d 49, 51-53 (8th Cir. 1982) (holding that a district court abused its discretion in denying a new trial in light of its erroneous exclusion of evidence); *cf. Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir. 1989) (affirming the grant of a new trial where the district court erroneously admitted evidence).

## B.  Trial Errors

We begin by analyzing the district court's ruling that the gravel road was a public highway as a matter of Montana law. From there, we review other errors assigned by Burlington.

### 1.  The Gravel Road is not a Public Highway

Burlington contests the district court's determination that the gravel road was a public highway as a matter of Montana law. This court reviews legal conclusions de novo. *Rodriguez v. Panayiotou*, 314 F.3d 979, 983 (9th Cir. 2002).

Preliminarily, we pause to address plaintiff's charge that Burlington may not challenge this ruling on appeal since it did not object to the underlying jury instructions. We note that Burlington challenged the ruling on many occasions, e.g., by opposing and filing motions in limine, and by orally asking for reconsideration of the ruling in light of the evidence pre-

sented at various points in the trial. In fact, District Judge Cebull warned Burlington that he was not inclined to "rehash" the issue any further. In light of its definitive ruling on a motion in limine and subsequent warning about rehashing the issue, the district court was fully informed of Burlington's position on the jury instructions and any further objection would have been superfluous and futile as well as contrary to the court's warning. *See Mukhtar v. Cal. State Univ. Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002), *amended by* 319 F.3d 1073 (9th Cir. 2003).

Turning to the merits of Burlington's arguments, the district court found that the gravel road was a public highway because, as indicated in the 1968 MDT permit, the land on which the road runs is owned by the state and the road is open for vehicular travel to the "traveling public." We do not view the language in the permit as a sufficient basis on which to rule that the road is a public highway. Instead, the road's potential status as a public highway hinges on whether it was "publicly maintained," Mont. Code Ann. § 61-1-201, "dedicated to public use," or "acquired by adverse use by the public, with jurisdiction having been assumed by the state . . . ." *Id*. §§ 60-1-103(22)(b), (d).[3]

### a.   No Public Maintenance

**[1]** Although the MDT permit does indicate that the state may supervise and dictate the terms of the road's maintenance, it squarely places the burden of maintenance on the permittee. Despite that, the district court may have been misled into believing that the road was publicly maintained. Indeed, Paul Bronson, the Field Maintenance Chief for the Billings District of the MDT, attested in an affidavit that his

---

[3]We find plaintiff's position — that the road must be public because it is not private — unconvincing, insofar as plaintiff cites no authority for the proposition that every road in Montana must either be a public highway or a private driveway.

staff had "performed maintenance on this approach during the fall of 1998."

But in a subsequent deposition, Bronson clarified that, by "maintenance," he was referring to the fact that his crew had elevated the point where the gravel meets Highway 87 on one occasion only, to make a smoother transition. Also, Mike Bousliman, the systems operation manager for the MDT's Maintenance Division, confirmed in his affidavit that the road has never been included in the state maintenance system, and that the MDT has never maintained it. Jerry Miller, the road superintendent for Big Horn County, declared in his affidavit that the gravel road has not been maintained by Big Horn County.

The district court inexplicably rejected the significance of Bronson's deposition testimony and the affidavits of Bousliman and Miller. Had the district court properly considered this evidence, however, it could not have found that the road was publicly maintained. Undaunted, plaintiff points to evidence indicating that some unidentified person (perhaps from the Bureau of Indian Affairs or maybe from the Crow Tribe) infrequently plowed the road in wintertime. This evidence is not sufficient to show that the road was publicly maintained.

[2] Plaintiff responds that the gravel road indisputably runs along Montana land (up to the point where it crosses Burlington property), and that the lack of maintenance cannot, as a matter of Montana law, be used to demonstrate that the state has abandoned a road. This logic is backwards. The idea that Montana may not abandon a public road by failing to maintain it presupposes that the road was public at sometime to begin with. If the state never declared the road public, never assumed jurisdiction over it, and never maintained it, there is no public road to abandon. We conclude that the road was not publicly maintained.

### b.   No Dedication to Public Use or Assumption of Jurisdiction

**[3]** The record does not contain evidence that the gravel road was "dedicated to public use" as that phrase is used in Mont. Code Ann. § 60-1-103(22)(b). *See State v. Taylor*, 203 Mont. 284, 288, 661 P.2d 33, 35 (1983) (finding dedication established by testimony that a document was filed with the clerk recorder's office); *Kaufman v. Butte*, 48 Mont. 400, 407-08, 138 P. 770, 771 (1914) (determining a filed plat map served as a common law dedication). Because the road was not publicly maintained or dedicated to public use, it cannot be considered a public highway under applicable Montana law unless it was "acquired by adverse use by the public, with jurisdiction having been assumed by the state . . . ." Mont. Code Ann. § 60-1-103(22)(d).

The language of the controlling statute leaves little doubt that jurisdiction over a road in Montana must be assumed by the state, or some political subdivision thereof, in order for the road to be transformed into a public highway by adverse usage. *See id.*; *see also Pederson v. Dawson County*, 303 Mont. 158, 163, 17 P.3d 393, 396 (2000) ("[C]ounty roads cannot be created without the county's [expressed] intent . . . to do so."). To hold otherwise could impose an impractical burden on the state of Montana.

Indeed, according to the amicus brief filed in this appeal by the MDT, there are more miles of road open to the public in the state of Montana, 69,542 miles to be exact, than there are miles of highway in the entire United States Interstate System, which total 45,500. Currently, the state has assumed jurisdiction and maintenance over just 10,775 miles of road in Montana. With its small population of 915,500, there is not a sufficient tax base or labor pool for the state to maintain all of the roads open to the public. Therefore, the state must be able to select the roads that it is willing to maintain as public highways.

Plaintiff's attempts to avoid this construction of § 60-1-103(22)(d) are unavailing. First, plaintiff's reliance on the Montana Supreme Court's opinion in *Hitshew v. Butte/Silver Bow County*, 293 Mont. 212, 974 P.2d 650 (1999), is misplaced. That opinion did not analyze the requirement that a state assume jurisdiction; on the contrary, it addressed whether the defendant had provided sufficient evidence of adverse possession to shift the burden to the plaintiff to show that the use of the land in question was permissive. 293 Mont. at 218-19, 974 P.2d at 654-55.

Second, plaintiff reads too much into the language of *Granite Co. v. Komberec,* where the Montana Supreme Court acknowledged that "the burden *on a county* of demonstrating that it acquired jurisdiction to create a road has been diminished . . . ." 245 Mont. 252, 259, 800 P.2d 166, 170 (1990) (emphasis added), *overruled on other grounds by Warnack v. Coneen Family Trust*, 266 Mont. 203, 214-15, 879 P.2d 715, 722 (1994). In other words, *Granite Co. v. Komberec* did nothing to reduce the burden *on a third party or an average citizen* to show that the state or one of its subdivisions had assumed jurisdiction. After all, a state or one of its subdivisions presumably may assume jurisdiction merely by saying so, whereas an average citizen may not so easily impose jurisdiction on the state or one of its subdivisions.

Third, the analysis in *Johnson v. McMillan* is inapposite. 238 Mont. 393, 778 P.2d 395 (1989), *overruled on other grounds by Warnack*, 266 Mont. at 214-15, 879 P.2d at 722. In that case, the Montana Supreme Court held that a particular road had become "a public road" or "a public way" through adverse usage. 238 Mont. at 395-97, 778 P.2d at 396-97. In so doing, the court never mentioned whether the state or one of its subdivisions had assumed jurisdiction over the road. But, at the same time, the court never hinted that it was construing any part of Mont. Code Ann. § 60-1-103, which is controlling here. We are unwilling to stretch the partially overruled holding in *Johnson* so far as to construe it as a

license to ignore the language in § 60-1-103(22)(d) requiring the assumption of jurisdiction by the state.

Rather than shifting jurisdiction over the gravel road to the state, the MDT permit places jurisdiction with the permittee subject to supervision and revocation by the state. Plaintiff points to other evidence indicating that Burlington considered the road to be a public highway; namely, an Industrial Track Agreement entered into by Burlington and Cenex's predecessor in 1971, an Accident Report submitted by Burlington to the U.S. Department of Transportation concerning the 1975 accident, and a Private Roadway and Crossing Agreement between Burlington and a third party in 1997. This evidence has no bearing, however, on whether the state or one of its subdivisions assumed jurisdiction over the road, much less whether the road was maintained by public resources, dedicated to public usage, or acquired by adverse usage.[4] In short, there is no evidence in the record establishing that the state assumed jurisdiction over the road.

**[4]** We hold that the gravel road was not a public highway as a matter of Montana law at the time of Dorn's death. In light of our holding, we need not reach Burlington's alternative argument, to wit, that the district court erred in excluding evidence indicating that Burlington believed the road to be a private driveway.

## 2.   Burlington's Efforts to Impeach Wiesnewski's Testimony

The theory pressed by Burlington at trial was that Dorn crossed the tracks at a 90-degree angle, regardless of whether

---

[4]Being unable to predict what, if any, evidence will be presented upon retrial, we do not express an opinion as to whether the Industrial Track Agreement, the Accident Report, or the Private Roadway and Crossing Agreement could be admissible for purposes of impeaching Burlington's purported view of the road as a private driveway.

it was legal for him to do so. Thus, even if the road was a public highway, Burlington insists that the district court improperly thwarted its attempts to cross-examine Wiesnewski regarding the angle of Dorn's truck as it traversed the crossing. Decisions limiting the scope of cross-examination are reviewed for an abuse of discretion. *See Robertson v. Burlington N. R.R. Co.*, 32 F.3d 408, 411 (9th Cir. 1994).

**[5]** We agree with Burlington on this point. Testimony concerning the angle at which Dorn crossed the tracks is not argument as to whether he should have violated a traffic law, but evidence of what actually happened. The district court abused its discretion in preventing the jury from weighing this evidence.

**[6]** According to the district court, Burlington's inquiries of Wiesnewski regarding the videotaped depiction or his own recollection of the angle of Dorn's tire mark would "call for expert testimony that was not disclosed." Wiesnewski's perception of the angle of the tire mark, however, would not constitute the opinion of an expert, but the observation of a percipient witness, *see* Fed. R. Evid. 601-602, or a permissible opinion by a lay witness. *See* Fed. R. Evid. 701; *see also* 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 701.03[4][a], at 701-21 to 701-22 (2d ed. 2004); *Dunn v. St. Louis-San Francisco Ry. Co.*, 370 F.2d 681, 685 (10th Cir. 1966) ("[A] uniformed highway officer [testified] . . . on the basis of his observation of the marks left on the truck and the boxcar . . . that the boxcar had been standing still at the moment of impact. We quite agree that it would have been preferable to have . . . the officer [describe] what he saw . . . [rather than] state deductions which the jury could make as easily as he.").

**[7]** Even more troubling is the district court's decision to strike and instruct the jury to disregard Wiesnewski's cross-examination concession that he believed that Dorn's truck was perpendicular to the tracks. The district court based this

decision on the ground that Wiesnewski's remark was "directly contrary to his testimony on direct." Of course, "[i]mpeachment by contradiction is authorized by Rule 607 [of the Federal Rules of Evidence]." Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence Manual § 12.01[4], at 12-16 (2003). Finding no authority that would validate these rulings, we conclude that it was error for the district court to encumber Wiesnewski's testimony in this manner.

Plaintiff insists that the errors were harmless since Wiesnewski was allowed to testify at a different point that the truck was perpendicular to the tracks. Plaintiff also claims that the district court permitted another Highway Patrol officer, Eric Winburn, as well as Burlington employees, to testify similarly. These arguments are faulty, in both a factual and a legal sense.

The testimony of the two officers cited by plaintiff merely recounts statements made by Burlington employees to the officers concerning what the employees saw from the train at the time of the accident. In other words, the officers did not testify that they thought the truck crossed the tracks at a right angle, but only that Burlington employees had said as much. Furthermore, the jurors easily could discount as biased the assertions of Burlington's employees that Dorn had crossed at a 90-degree angle — whereas they may not have been so inclined to treat a neutral law enforcement official, professing on direct examination that the truck had crossed at a 45-degree angle, with such scrutiny. *See Darbin v. Nourse*, 664 F.2d 1109, 1114-15 (9th Cir. 1981) (acknowledging the potential for jurors to give "undue weight to the testimony of law enforcement officers because of their official positions"); Weinstein's Evidence Manual § 12.01[2], at 12-4 ("[B]ias is always significant in assessing the witness's credibility . . . .").

The question of whether Dorn crossed the tracks perpendicularly, or simply followed the road's sharper angle, is not

insignificant. The record suggests that crossing at a wider angle would have provided Dorn with a longer view of the tracks to the north, perhaps even a panorama sufficient to avoid a collision. Hence, the extent to which Dorn's negligence contributed to the tragedy likely would be greater under that scenario than if the jurors were persuaded that he had crossed the tracks by following the road's more narrow angle.

### 3.    Burlington's Attempts to Impeach Berg's Opinions

Burlington contends that, in light of Berg opining that it was not possible to "square up" to the crossing without going off the road, the district court should not have excluded rebuttal testimony from lay witnesses indicating that they had regularly accomplished this feat without going off the road.

**[8]** The erroneously encumbered testimony of Officer Wiesnewski suggested that Dorn had crossed the tracks at a 45-degree angle. Adding the expert opinion of a witness who holds a doctorate degree in civil engineering — that it was a physical impossibility for Dorn to cross at a right angle, as Burlington's employees claimed — could only bolster the idea that Dorn must have crossed at a sharper angle. We hold that the district court abused its discretion by excluding testimony from seemingly unbiased witnesses whose ordinary experiences would tend to rebut, if not impeach, Berg's conclusion, and that the error was not harmless.

Recalling our holding that the gravel road was not a public highway at the time of the accident, we believe that evidence concerning the warnings other drivers gave Dorn about the need to "square up" to the crossing could be relevant to a number of issues upon retrial, for instance, Dorn's contributory negligence, or perhaps even the claim for punitive damages. Such relevance would cause the evidence to become admissible, so long as it is not excludable for some other reason, upon retrial.

### 4. Hedonic Damages

Burlington claims that the district court erred by allowing plaintiff's expert, Stan Smith, to provide expert testimony regarding hedonic damages, and by excluding the testimony of its expert, Thomas Ireland, who would have refuted Smith's opinions. We agree that, assuming hedonic damages are recoverable under Montana law and that Stan Smith's testimony was admissible, the district court erred in excluding Thomas Ireland's testimony.

### a. Hedonic Damages in Montana

Our first inquiry is whether Montana law permits the recovery of hedonic damages in wrongful-death or survivorship actions. *See Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1245-46 (10th Cir. 2000) (affirming admission of testimony concerning hedonic damages because New Mexico law allows recovery of such damages); Weinstein's Federal Evidence § 702.02(7), at 702-30 to 702-31 (noting situations where "state substantive law will impinge upon the trial court's admissibility decision" regarding expert witnesses; for instance, when state law establishes "elements of a cause of action or defense"). It appears that the Montana Supreme Court has not taken a firm position on the availability of hedonic damages. *See Christofferson v. City of Great Falls*, 316 Mont. 469, 484, 74 P.3d 1021, 1031 (2003) (declining to address the issue because it was moot); *Hunt v. K-Mart Corp.*, 294 Mont. 444, 448, 981 P.2d 275, 279 (1999) (permitting expert opinion regarding hedonic damages because defendant failed to pose a timely objection to the testimony); *Henrickson v. State of Montana*, 319 Mont. 307, 328 (allowing for, but not defining, "damages for loss of ability to pursue an established course of life").

Burlington cites a number of authorities from other jurisdictions holding either that it was not an abuse of discretion to bar expert testimony concerning hedonic damages, or that

it was error to allow such testimony.[5] These opinions, however, do not shed light on Montana's perspective. As we have not been directed to a firm statement of Montana law, we cannot say that the district court's decision to allow hedonic damages "lies beyond the pale of reasonable justification under the circumstances." *Harman v. Apfel*, 211 F.3d 1172, 1175 (9th Cir. 2000).

### b. Smith's Testimony

Burlington does not challenge Smith's qualifications, but insists only that his testimony was not helpful to, or invaded the province of, the jurors. To be admissible, an expert witness's opinion must be capable of assisting the trier of fact in interpreting the evidence or resolving a disputed fact. Fed. R. Evid. 702. We share some of Burlington's concerns with Smith's methodology.

---

[5]*See Mercado v. Ahmed*, 974 F.2d 863, 868-71 (7th Cir. 1992) (declining to reverse a judgment based on the exclusion of Smith's testimony); *Loth v. Truck-A-Way Corp.*, 60 Cal. App. 4th 757, 760, 70 Cal. Rptr. 2d 571, 573 (Cal. Ct. App. 1998) ("We conclude [that Smith's] testimony on hedonic damages was inadmissible as a matter of law and its admission was prejudicial."); *Scharrel v. Wal-Mart Stores*, 949 P.2d 89, 92 (Colo. App. 1997) (holding that testimony concerning hedonic damages is inadmissible under Colorado law); *Montalvo v. Lapez*, 77 Haw. 282, 303-04, 884 P.2d 345, 366-67 (1994) (affirming trial court's exclusion of hedonic damages evidence); *Fetzer v. Wood*, 211 Ill. App. 3d 70, 84-86, 569 N.E.2d 1237, 1246-47 (Ill. App. 1991) (affirming the exclusion of Smith's testimony); *Southlake Limousine & Coach, Inc. v. Brock*, 578 N.E.2d 677, 682 (Ind. App. 1991) (holding that Smith's testimony on hedonic damages "invade[d] the province of the jury")*; Longman v. Allstate Ins. Co.*, 635 So. 2d 343, 355 (La. App. 1994) (holding that trial court did not abuse its discretion in barring Smith's testimony); *Anderson v. Neb. Dep't of Soc. Servs.*, 248 Neb. 651, 664-71, 538 N.W.2d 732, 741-45 (1995) (reversing damages award based on admission of Smith's testimony); *Wilt v. Buracker*, 191 W.Va. 39, 50, 443 S.E.2d 196, 207 (1993) ("[W]e conclude that the loss of enjoyment of life resulting from a permanent injury is part of the general measure of damages . . . and is not subject to an economic calculation."); *see also Smith*, 214 F.3d at 1245 (inventorying additional cases where Smith's testimony was excluded).

Smith testified to a value for what he called "hedonic damages," and what is commonly called in tort law jury instructions "loss of enjoyment of life." His methodology was to use government statistics to determine what risk premium employees demand to work in riskier jobs as opposed to the less risky jobs they could get with the same credentials, what people pay for safer equipment and consumer goods as compared with less safe ones, what people spend on government-required safety equipment, what government spends on programs that reduce risk of death, and what government regulations require people to spend on reduction of risk. He came up with a figure for loss of enjoyment of life for an average person.

This methodology may have some utility. It may be informative to a jury to know what people spend voluntarily out of their own pockets to reduce their own chances of death. The figure Smith arrived at gives some finitude to a question that can sound like a probe into the infinite.

The usefulness of Smith's testimony, however, was reduced because he averaged this figure with other estimates, likely to be much higher, and not at all informative about how much people value their own enjoyment of life. That a government safety program costs a certain amount per life saved, or that the government requires purchase of a certain kind of safety equipment, may suggest a collective policy judgment the government has made, or may represent a policy selected for reasons other than the cost-benefit analysis "hedonic analysis" implies, or even a mistaken policy. The admissibility of testimony such as that given by Smith concerning hedonic damages is committed to the district court's sound discretion.

Smith purported to be telling the jury the value that people placed on the enjoyment of life, but he did not give the jurors that figure. Instead he gave them a figure that combined the value that people place on their own lives with the expenses of, or caused by, government safety programs. Because we

reverse below regarding Ireland's testimony, we need not reach a conclusion on whether the district court abused its discretion in admitting Smith's testimony.

### c.   Admissibility of Ireland's Testimony

Burlington maintains that the district court committed reversible error by excluding Ireland's testimony, which would have discredited Smith's opinions concerning hedonic damages. Although the standard for reviewing this issue is rather deferential, *see White v. Ford Motor Co.*, 312 F.3d 998, 1006 (9th Cir. 2002) (admissibility of expert testimony is reviewed for an abuse of discretion), there is merit to Burlington's position.

**[9]** The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, was not overly concerned about the prospect that some dubious scientific theories may pass the gatekeeper and reach the jury under the liberal standard of admissibility set forth in that opinion; indeed, the Court said, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. 579, 596 (1993). The Court went on to note that a district court's initial gatekeeping choice to allow an expert's opinion testimony does not prevent that same district court from deciding that the opinion is not scientifically sound after the expert has shared his or her opinions with the jury. *Id.*

**[10]** This reasoning suggests that a district court, though not compelled to do so, may change its mind regarding the admissibility of one expert's opinions after a competing expert offers testimony challenging the first expert's shaky theories. Moreover, we have held that the "[a]uthority to determine the victor in such a 'battle of expert witnesses' is properly reposed in the jury." *Humetrix, Inc. v. Gemplus S.C.A.*, 268 F.3d 910, 919 (9th Cir. 2001). Consequently, "the

reasonableness of the assumptions underlying the experts' . . . analysis, [or] criticisms of an expert's method of calculation [are] matter[s] for the jury's consideration in weighing that evidence." *Id.* (third alteration in original) (citations omitted).

Burlington's position is further supported by commentators and other persuasive authorities, one of which explains:

> A trial court's determination that the proffered testimony of one expert witness is reliable and helpful does not necessarily mean that *the contradictory testimony of another witness*, concerning the same subject matter but *using a different methodology*, is not also reliable and helpful.
>
>  . . .
>
>  . . . If two contradictory expert witnesses [can offer testimony that is reliable and helpful], both are admissible, and it is the function of the finder of fact, not the trial court, to determine which is the more trustworthy and credible.

Weinstein's Federal Evidence § 702.05[3], at 702-80.12 to 702-80.13 (emphasis added); *see also Jahn v. Equine Servs., PSC*, 233 F.3d 382, 391 (6th Cir. 2000) ("[T]he district court apparently *weighed* the pathologist's testimony against Jahn's expert[s] . . . [and] found the opinions of [Jahn's experts] suspect because they contradicted that of the pathologist. But . . . determining which is more credible should be left for the finder of fact and should not be considered when ruling on . . . admissibility.").

**[11]** We conclude that it was error for the district court to bar Ireland's testimony.

### d. The Error was Prejudicial

Plaintiff claims that the jury did not award hedonic damages to her in any event; ergo, the district court's decisions on

hedonic-damages evidence were harmless because Smith's uncontested opinions did not impact the verdict. The record does not support this position.

Plaintiff asked the jury to award $7,799 for Dorn's funeral expenses, $1,711,527 for lost income and benefits, and $3,300,000 for hedonic damages. By way of a special verdict, the jury awarded plaintiff $1,000,000 in wrongful-death damages and $1,008,000 in survivorship damages: however, the verdict form provides no further insight into the calculations of those sums.

**[12]** Mathematically, the survivorship damages could be construed to resemble the funeral expenses combined with some generous measure of lost income and benefits, without any award of hedonic damages, but such an interpretation would be founded on conjecture. By the same token, the awards could be taken as including some measure of hedonic damages, but such a calculation would also be speculative. Since both propositions are equally conjectural, we are unable to say "that the jury's verdict is more probably than not untainted by the error." *Abromson v. Am. Pac. Corp.*, 114 F.3d 898, 903 (9th Cir. 1997). Accordingly, we cannot agree with plaintiff that the error was harmless.

## 5.    Refusing the Corporate Responsibility Instruction

According to Burlington, the district court erred in refusing to instruct the jury that punitive damages could only be awarded under certain circumstances that are listed in the Restatement (Second) of Torts § 909 (1979). We will not reverse a verdict based on a district court's refusal to instruct the jury in a manner requested by one of the parties unless the district court abused its discretion and the absence of the requested instruction amounts to prejudicial error. *See White*, 312 F.3d at 1012.

The instruction requested by Burlington would have explained that punitive damages are appropriate only where

the corporation, acting through its management or a managerial employee, either committed, authorized or ratified the act or omission, or if the non-managerial employee who committed the act or omission was unfit and the corporation was reckless in employing that individual. The problem that Burlington faces here is the lack of any evidence indicating that a non-managerial employee decided against realigning the crossing, and the existence of sufficient evidence to infer that managerial employees knew of the danger and declined to take responsive measures. In light of such evidence, it does not appear that Burlington was prejudiced by the district court refusing the instruction. Because we cannot predict what evidence might be presented by the parties on retrial, we decline to hold whether this instruction would be appropriate at that point.

### 6.    Review of the Punitive Damages Award

Burlington does not argue that there was insufficient evidence at trial to support the jury's determinations that Burlington either had knowledge of facts, or intentionally disregarded facts, that created a strong probability of harm to Dorn, and that Burlington deliberately acted with indifference to that circumstance. Indeed, the prior accidents at the site would appear to support such an inference. Instead, Burlington's objections are limited to the district court's refusal to give a certain instruction on punitive damages and the district court's review of the award. We decline to address these claims as our rulings on the private character of the gravel road, the limitations on the testimony of Officer Wiesnewski, the limitations on Burlington's attempt to impeach Dr. Berg's testimony, and the exclusion of Ireland's testimony (assuming that hedonic damages are available in Montana), require a new trial both on liability and damages.

### IV.    Conclusion

[13] We hold that the cumulative errors described above mandate a new trial in this action, both on liability and dam-

ages. The judgment of the district court is **REVERSED** and this case is **REMANDED** for further proceedings consistent with this opinion.